## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Case: 1:23−cv−03766 JURY DEMAND
Assigned To : Kollar−Kotelly, Colleen
Assign. Date : 12/4/2023
Description: Pro Se Gen. Civ. (F−DECK)

DR. SHIVA AYYADURAI,

*Plaintiff.*

    v.

UNITED STATES OF AMERICA;

CYBERSECURITY INFRASTRUCTURE
 SECURITY AGENCY ("CISA");
    Jen Easterly,
    Unknown CISA Officials,

STATE ACTORS;
    John Does1-10,

SOCIAL MEDIA COMPANIES;
    Twitter, Inc. and X.com, Inc.,
    Google, Llc and YouTube, Llc,
    Facebook, Inc.,

*Defendants.*

Civil Action No. _____

JURY DEMANDED

## ORIGINAL COMPLAINT

## INTRODUCTION

1. This case is about the weaponization of a coordinated infrastructure of governmental and

ostensibly private actors to silence the political speech of a U.S. Presidential Candidate and

a former candidate for U.S. Senate, the Plaintiff Dr. Shiva Ayyadurai ("Dr. Shiva"),

criticizing government actors.  It was Dr. Shiva who was first victim of this infrastructure

and the one **who *first* discovered and shared the existence of this <u>infrastructure</u>** in

*Ayyadurai v. Twitter et al.,* (long before Elon Musk's "Twitter Files," "DHS Leaks,"

**RECEIVED**

DEC  - 4  2023

1

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

*Missouri v. Biden*, etc.) in a Censorship Network diagram that was accepted as evidence in Federal court:



2. This Government Censorship Network Infrastructure a.k.a "Government Backdoor Censorship Portal" into social media platforms was uncovered and revealed by Dr. Shiva starting in October of 2020 during Dr. Shiva's historic Federal lawsuit in Massachusetts during 2020-2021.

3. In response to Dr. Shiva's tweets articulating a government employee's role in destroying the digital ballot images used to tabulate votes the Defendants acted swiftly. Instead of seeking to rebut his speech publicly, they leveraged the deep relationships among them and the Defendants had built together to regulate speech to remove the at-issue tweets and later Dr. Shiva from Twitter entirely on February 1, 2021, thus effectively silencing him.

4. After he was put back on Twitter in December 2022, the censorship continues to the present, though in a far more sophisticated manner, where Dr. Shiva now remains in a "Digital Cage" so Dr. Shiva's tweets, posts, videos, views, etc. are now severely limited in reaching his followers across all social media platforms by the Defendants Twitter (also known as X), Facebook, YouTube (collectively hereinafter referred to as the set as "Social Media Companies") using sophisticated algorithms, in coordination; and moreover, using artificial intelligence ("AI") techniques e.g. predictive analytics, machine learning, these Social Media Companies redirect Dr. Shiva's followers and potential followers to his opponents who are running for President.

5. To state the obvious, criticism of government actors by a political candidate for office is a species of speech at the very heart of free speech protections under both the First Amendment and Constitutions of every State. The Defendants' deep-seated conspiracy to silence Dr. Shiva is a clear violation of his speech rights, and the machinery that the Defendants mobilized, to undertake to silence him remains solidly in place, and is being further developed and enhanced every day.

6. Social media platforms, and Twitter in particular, is essential for any political candidate. It provides a unique and broad mechanism for a political candidate to engage with supporters and potential supporters on a daily basis. It is not possible for any national politician to succeed today without Twitter. By removing Dr. Shiva from Twitter on February 1, 2021, and then later putting him back on in December of 2022 in a "Digital Cage," the Defendants effectively strip Dr. Shiva of his ability to fully engage with supporters across the country to succeed as a political candidate.

7. The Defendants in recent years have worked together to develop an infrastructure for regulating speech on social media platforms, including as sometimes referred to as the

Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC). They have articulated their vision for doing so through a series of "Playbooks" which set out the theory and practice of regulating speech which government officials choose to label as "misinformation" or "disinformation." "Misinformation" and "disinformation" are such vague and malleable terms, however, that they amount to a means for government actors to choose to censor the speech they simply do not like by applying one of those labels, thus enabling classic viewpoint discrimination.

8. Critically, and among other things, one type of "misinformation" which the Playbooks endorse censoring is speech that disparages elections officials. Of course, this "best practice" contradicts the fundamental First Amendment right to criticize the government. Social Media Companies participation in the development of this infrastructure is clear: they contributed to the development of the Playbooks themselves and grant formalized, preferential treatment to government actors who seek to censor speech.

9. Even beyond developing a formal infrastructure for regulating speech, the Defendants together with a host of others built a web relationships providing informal channels through which they can ensure that speech which they deem undesirable is censored. A visual depiction of the network of individuals and agencies that comprise this web of governmental and ostensibly private actors is shown above. The government-actor Defendants here coerced, strongly encouraged, and indeed work in an explicitly coordinated fashion with Social Media Companies to regulate the speech they claim is problematic.

10. The Defendants put both the formal infrastructure they developed as well as the informal channels of influence to strike against Dr. Shiva's speech once he criticized government actors. When on September 24, 2020 Dr. Shiva, without identifying a State Actor, tweeted about the government's failure to preserve, and thus to destroy, the ballot images used to

tabulate votes, the State Actors caused a report to Twitter and the government put out a press release disputing the claim, thus combating what the Defendants viewed as "bad speech" with "good speech." The State Actor further filed a complaint with Twitter through the designated Partner Support Portal ("PSP") to which they had access from the government's Twitter account, and which granted her preferential treatment by Twitter because the Division is a "Trusted Twitter Partner."

11. But when Dr. Shiva on September 25, 2020 screenshot tweeted out four screenshots of his email correspondence with the government regarding the destruction of digital ballot images and criticized their role in destroying ballot images, which he explained are the ballots themselves because they are used to tabulate votes, the Defendants acted in coordinated fashion to ensure the four screenshot tweets were deleted. Instead of filing a complaint with Twitter directly or putting out a press release, the government State Actors covertly used their close connection with the Defendants to cause Defendants to file a complaint with Twitter. As a result of Defendants, coercion, strong encouragement, and coordination with Twitter, their complaint to Twitter had the intended effect; the tweets were deleted.

12. Rather than exercise its independent judgement, Twitter undertook exactly the action the State Actors wanted in deleting the September 25, 2020 screenshot tweets. Twitter acted as it was told to act by the State Actors both because it values it cooperative relationship with the other Defendants and because it recognizes that as a publicly traded company that faces intense scrutiny in the public eye, a failure to remove content deemed to be "misinformation" would harm its valuation and image. For Twitter, there is severe risk in disagreeing with the complaint of government actors, and others who are directly integrated into the web of government regulation of social media platforms.

13. As a direct result of government's conduct, Twitter and the EI-ISAC infrastructure continued

to monitor Dr. Shiva's tweets and social media activities. Indeed, months later on February 1, 2021 when Dr. Shiva re-tweeted his September 25, 2020 screenshot tweets regarding the government  via an educational lecture about this lawsuit, Twitter acted immediately to deplatform him. Within ***seventeen minutes*** of Dr. Shiva posting the September 25, 2020 screenshot tweets, he received an official Twitter email informing him that Twitter had suspended his account. Those seventeen minutes permitted no time for Twitter to exercise any independent judgment; it kicked Dr. Shiva off Twitter because the other Defendants wanted it to do so. Incredibly, State Actors, and Twitter's counsel who has submitted multiple affidavits in this case, Stacia Cardille ("Cardille"), were all together at a Winter Conference when Twitter deplatformed Dr. Shiva, at which State Actors had invited Cardille to give a talk on "Managing Misinformation on Social Media Platforms."

14. The Defendants have been determined to conceal from this Court and from the public their coordinated efforts to regulate speech on social media broadly and as to Dr. Shiva in particular. Already in this case, multiple of the Defendants have made repeated misrepresentation of omission as well as direct misrepresentations including simply as a handful of examples[1].

15. State Actors in their October 29, 2020 affidavits about their reports to Twitter of Dr. Shiva's September 24, 2020 failed to disclose that the Massachusetts Elections Division is a Twitter Trusted Partner entitled to preferential treatment by Twitter, including where it submits complaint via the Partner Support Portal;

16. State Actor swore that they never reported Dr. Shiva's September 25, 2020 screenshot tweets regarding her emails at all, when she actually reported that tweet to another State Actor in order to maximize the impact of the complaint to Twitter;

---

[1] The documentary evidence of each of these misrepresentations, and other, is set out below.

17.  Defendants failed to disclose to the Court the existence of the Playbooks setting out the means by which they were to regulate speech on social media; and Cardille on behalf of Twitter misrepresented that Twitter deplatformed Dr. Shiva on February 3, 2021, despite the existence of the February 1, 2021 email announcing Dr. Shiva's suspension from Twitter, in order to create the misimpression that Twitter had two days to consider whether to deplatform Dr. Shiva.

18. The infrastructure the Defendants helped to build and the relationships they used to silence Dr. Shiva remain firmly in place, to the present. Though Dr. Shiva may have been among the first and most prominent of individuals to suffer the consequences of a web of government actors focused on removing speech that "disparages" them in their role as government actors or which they otherwise find problematic in the absence of action by this Court he will not be the last.

19. A private entity violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  "The government cannot accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id. COPY*

20. That is exactly what has occurred over the past several years, beginning with express and implied threats from government officials and culminating in the Biden Administration's open and explicit censorship programs.  Having threatened and cajoled social-media platforms for years to censor viewpoints and speakers disfavored by the Left, senior government officials  in  the Executive Branch have moved into a phase of open collusion with social-media companies to suppress disfavored speakers, viewpoints, and content on social-media

platforms under the Orwellian guise of halting so-called "disinformation," "misinformation," and "malinformation."

21. The First Amendment of the U.S. Constitution, which was ratified on December 15, 1791, explicitly states: "Congress **shall make no law** … abridging the freedom of speech, or of the press…" U.S. CONST. amend. I.

22. However, on  November 16, 2018, Congress of the United States **unanimously** voted to pass a bill that created the Cybersecurity Information Security Agency (CISA), which facilitated the creation of the Government Censorship Network Infrastructure, first uncovered by Dr. Shiva in 2020, to silence speech of Americans through social media platforms. In short, Congress **made a law** for ***"abridging the freedom of speech;"* thus, betraying the Constitution.** And, it was President Donald J. Trump, a Republican, with slogans of "Make America Great Again," "Drain the Swamp," and "Lock Her Up," who signed CISA into Law.

23. CISA provided government actors the "Backdoor Portal" into social media companies to surveil and silence speech of all Americans.

24. The Atlantic Council along with foreign agents e.g. UK, Israel, etc. with close relationships to intelligence agencies, who do not believe in the First Amendment, funded and/or coerced directly and indirectly members of U.S. Congress to pass CISA unanimously so as to allow surveillance and censoring of Americans through these Backdoor Portals.

25. It cannot be forgotten that these parties e.g. Atlantic Council members, worked closely at the Belfer School at the Harvard Kennedy School of Government to author the "Playbooks," uncovered by Dr. Shiva in *Ayyadurai v. Twitter et al.,* that provided step-by-step methods to surveil and censor Americans by developing Backdoor Portals into Social Media Companies.

26. Dr. Shiva Ayyadurai, starting in October of 2020 then a U.S. Senate Candidate, **was the first** to uncover in his historic Federal lawsuit, that the government of the UNITED STATES OF

AMERICA, specifically the U.S. Department of Homeland Security's Cybersecurity Infrastructure Security Agency (CISA), established a Censorship Network Infrastructure a.k.a. "Backdoor Portal" into social media companies including Twitter (now known as X), Facebook, Google, YouTube, etc. to silence speech of WE THE PEOPLE of the United States. This Censorship Network Infrastructure, was submitted and accepted as evidence in *Ayyadurai v. Twitter et al.,* Federal court briefs.

27. On February 1, 2021, Dr. Shiva Ayyadurai, then a U.S. Senate Candidate was silenced – **permanently deplatformed from Twitter** - within 17 minutes of completing a video broadcast on Twitter for sharing the findings from his October 2020 lawsuit hearings of the "Partner Support Portal (PSP)" - the "Backdoor Portal" that government was using with Twitter to silence speech. The PSP is one element of Censorship Network Infrastructure.

28. Knowledge of Dr. Shiva Ayyadurai's discovery of this Censorship Network Infrastructure became known to an estimated 500 million people across the world in 2020-2021. People also came to understand from Dr. Shiva's lectures and videos that both Democrats and Republicans; "Left" and "Right"; private, state and federal actors; had established this Censorship Network Infrastructure to silence speech of WE THE PEOPLE of the United States.

29. Interestingly enough, mainstream media, major social media influencers, including those claiming to be "fighters" for Free Speech such as Tucker Carlson, Glenn Greenwald, ACLU, **intentionally concealed** Dr. Shiva Ayyadurai's original findings in *Ayyadurai v. Twitter et al.,* then and now.

30. Additionally, lawsuits emerging after Dr. Shiva Ayyadurai's filings intentionally do not cite *Ayyadurai v. Twitter* lawsuit while wholesale plagiarizing his findings, while consistently alleging that the "Left," "Woke," the "Biden Administration" were solely responsible for

creating this Censorship Network Infrastructure. *Missouri v. Biden*, for example, is one egregious example of making this all about the "Left" while intentionally never citing Dr. Shiva Ayyadurai's original findings, though the Plaintiffs in that lawsuit were fully aware of Dr. Shiva's work, such as Jim Hoft of *Gateway Pundit*, who did multiple interviews and news stories of *Ayyadurai v. Twitter et al.*

31. The truth is: on November 16, 2018, it was a Republican, President Donald J. Trump, the man who barked "Make America Great Again" and "Drain the Swamp" signed into law a bill the Cybersecurity Infrastructure Security Act (CISA) that was UNANIMOUSLY approved by every member of  Congress – Democrat and Republican -  including the likes of Thomas Massie and Jim Jordan and others, who claim they are "fighters" for "Free Speech" and now even command Committees in Congress that aim to allegedly deter the very infrastructure Censorship Network Infrastructure to silence speech of WE THE PEOPLE, that these folks voted to create in 2018!

32. A little bit of research reveals that members of Congress are owned by Big Tech and Silicon Valley companies. Silicon Valley needs Section 230 immunity to maintain their high valuations on Wall Street.  Big Tech funds Republicans and ensures they are ineffective in fighting Big Tech's dominance. ([https://www.fastcompany.com/90535573/that-guy-yelling-during-the-antitrust-hearing-this-week-google-funds-him](https://www.fastcompany.com/90535573/that-guy-yelling-during-the-antitrust-hearing-this-week-google-funds-him),

[https://thefederalist.com/2021/07/17/its-high-time-gop-congressional-leaders-rejected-big-tech-dollars/](https://thefederalist.com/2021/07/17/its-high-time-gop-congressional-leaders-rejected-big-tech-dollars/),  https://www.washingtonexaminer.com/opinion/house-republicans-surrender-to-big-tech)

33. The truth is the Congress of the United States is owned by foreign actors and Big Tech.  This is why CISA was passed unanimously.  These external forces control the Congress of the United States.  Congress is unable to represent the interests of WE THE PEOPLE. This is

why it becomes penultimate that the Courts act to make accountable government actors, federal officials, who violate the U.S. Constitution. Since 1983, the Courts have been kicking the proverbial "can down the street" by not applying *Bivens* actions, and rather stating that Congress should pass legislation to make federal officials accountable to violations of the Constitution.  However, Congress is now the fox watching the hen house.

34. Social media platforms represent the new public square, as important as the Boston Common at the time the First Amendment was composed. That new public square must be protected with the same vigor as the original.

35. This case provides Courts the opportunity to exercise their separation of powers and make Congress and government actors accountable for violating the Constitution.


**JURY DEMAND**

36.  Plaintiff hereby demands that all eligible claims be tried to a jury.


**PARTIES**

37. Plaintiff DR. SHIVA AYYADURAI lives and works in Massachusetts. Dr. Shiva founded and runs multiple technology companies in Cambridge, MA at 701 Concord Avenue, and has now campaigned for federal office three times, including for U.S. Senate. Plaintiff Dr. Shiva Ayyadurai ("**Dr. Shiva**") lives and works in this District. He holds four (4) degrees from the Massachusetts Institute of Technology (MIT) including his PhD in Biological Engineering, where he collaborated on research with Professor Noam Chomsky, a noted linguist; and with Professor Robert Langer, a world-renowned engineer. Dr. Shiva founded and runs multiple technology companies in Cambridge, MA at 701 Concord Avenue, and has now campaigned for Federal office three times, including presently for U.S. Senate. He started his account on Twitter in August 2011 and since then has worked

assiduously to grow his presence. Until he was deplatformed by the Defendants on February 1, 2021, his Verified Twitter account was followed by 360,000 people, giving him a significant presence on the nation's social media landscape, a fact confirmed in great detail in the *Long Fuse Report*.

38. Defendant UNITED STATES OF AMERICA is the sovereign nation responsible for the lawful enforcement of immigration laws through, among others, officers, agents, and employees of CISA.

39. The Defendant JEN EASTERLY is the Director of the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security.  She is sued in her official capacity.

40. Defendant CYBERSECURITY INFRASTRUCTURE SECURITY AGENCY (CISA) is an agency within the Department of Homeland Security that is charged with protecting the United States' cybersecurity and physical infrastructure.

41. Unknown CISA Officials were individuals employed by CISA of the Defendant UNITED STATES OF AMERICA at all times relevant to this complaint.

42. Defendant STATE ACTORS coordinated with federal and private actors within the US Government Censorship Network Infrastructure.

43. Defendant John Does1-10 are STATE ACTORS who coordinated their activities with other Defendants.

44. Defendant SOCIAL MEDIA COMPANIES include Twitter (now known as X), Google, YouTube and Facebook.

45. Defendant, YouTube, LLC ("YouTube"), is a limited liability company organized and existing under the laws of Delaware. YouTube's sole member is defendant, Google, LLC ("Google").

46. Defendant, Google, is a Delaware corporation headquartered in Mountain View, California.

Google is an operating segment of Alphabet Inc., a public company (NASDAQ:GOOGL).

47. Defendant, X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in San Francisco, California. X Corp. is successor in interest to Twitter, Inc. X Corp. provides the X service ("X," formerly referred to as Twitter).

48. Defendant, Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, San Mateo County, California. Plaintiff owns and operates several products, including Facebook, Instagram, and Messenger.

## NON-DEFENDANT MEMBERS OF THE ENTERPRISE

49. Member Center for Internet Security (CIS) (https://www.cisecurity.org/) is a private entity that operates the Elections Infrastructure Information Sharing and Analysis Center™ (EI-ISAC®). Cohen pushed for the formation of EI-ISAC under the auspices of the private CIS, and for the creation of federal CISA. CIS is operated by Brigadier General (retd.) John M. Gilligan, formerly Chief Information Officer for the US Air Force and currently co-chair at the Cyber Committee of the Armed Forces Electronics Association; Tony Sager, formerly at the National Security Agency (NSA) for 34 years as an Information Assurance professional, mathematical cryptographer and software vulnerability analyst, who won the Presidential Rank Award; Curtis Dukes, formerly the Deputy National Manager for National Security Systems reporting directly to the Director of NSA and charged with securing systems that handle classified information or are otherwise critical to military and intelligence activities; Kathleen Moriarty, formerly Security Innovations Principal in Dell Technologies Office of the CTO, Internet Engineering Task Force (IETF) Security Area Director, and Operations Management in multiple roles with MIT Lincoln Laboratory; Colonel (retd.) Ed Mattison, who was the Chief of Information Assurance (Cybersecurity) at the Pentagon from 2013 - 2015, Senior Cybersecurity Advisor to the Secretary of the Army and the Lead IT Security Inspector

General; and others.

50. Member Charles Stewart III serves with Tassinari on the Board of the MIT Election Data Science Lab, which is funded by Pierre Omidyar. Stewart claimed to the Associated Press and to Reuters that Dr. Shiva was wrong to state that federal law requires retention of digital ballot images and thus not a credible person. Stewart did not disclose his close relationship with Tassinari.

51. Member The Atlantic Council is a member of the Global Cyber Alliance with the UK National Cyber Security Centre, City of London Police and NASED, and via its Digital Forensics Lab (Graham Brookie) funded the *Long Fuse Report* on the success of the infrastructure built by Cohen and Tassinari in silencing Dr. Shiva during his run for US Senate. The *Long Fuse Report* explicitly identified the First Amendment to the US Constitution as a problem that required a policy solution. The Atlantic Council is funded by the British Government.

52. Member National Association of Secretaries of State (NASS) is an integral part of the infrastructure built to enable government officials to silence the speech of US Citizens through EI-ISAC.

53. Member Pierre Omidyar, via his Democracy Fund, funded DemocracyWorks (NASED), CIS, Stanford Internet Observatory, Bipartisan Policy Center and the MIT Election Data Science Lab (Stewart III)

54. Member Craig Newmark funded the *Long Fuse Report* and the Global Cyber Alliance.

55. Member Ashwin Ramaswami is affiliated with CISA's Election Security Initiative, studied computer science at Stanford, and per the *Long Fuse Report* is one of the founders of the Election Integrity Partnership. He is a co-author of the *Long Fuse Report* along with Brookie *et al*, which detailed the use of 24/7 teams on shifts to surveil Dr. Shiva and sabotage his run for US Senate. Ramaswami changed the Wikipedia page on Dr. Shiva and attacked him as a "pseudo-scientist" who promotes conspiracy theories. Ramaswami has a placement at

14

Georgetown University in Washington DC to study law next, while remaining associated with CISA.

56. Member Robert Kolasky is a graduate of the Harvard Kennedy School and works at the US Department of Homeland Security and is a Director at CISA. Kolasky serves with Tassinari on the CISA Executive Committee of Election Infrastructure Government Coordinating Council (EI-GCC), and works with Cohen through the EI-GCC.

57. The State Department operates a "Global Engagement Center" within the State Department that conducts counter-"disinformation" activities.  According to the State Department's website, the Global Engagement Center's mission is "[t]o direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States, its allies, and partner nations." As alleged further herein, the Global Engagement Center is involved in procuring the censorship of private speech on social media, including of U.S. citizens.  The State Department also maintains an Office of Cyber Coordinator, a.k.a. Office of the Coordinator for Cyber Issues, that has, on information and belief, also been involved in federal social-media censorship activities.

58. U.S. Election Assistance Commission ("EAC") is an independent agency within the Government of the United States.  According to its website, the EAC "was established by the Help America Vote Act of 2002 (HAVA).  The EAC is an independent, bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration."

59. Mark A. Robbins is the Interim Executive Director of the EAC.  He is sued in his official

capacity.

60. Kristen Muthig is the Director of Communications for the EAC.  According to the EAC's website, Muthig "manages media relations, communications strategy and supports the commissioners and EAC leadership."  She is sued in her official capacity.

## FACTS

**A.  <u>The Defendants Develop and Implement a System for Censoring Political Speech, which They Used to Ensure that Dr. Shiva is Deplatformed from Twitter on February 1, 2021</u>**

61. The Defendants have played an integral role in developing and implementing the infrastructure by which various government and private actors regulate social media platforms, including to censor speech that they conclude constitutes "misinformation" or "disinformation" regarding elections. That system is constructed of a tightly knit web of governmental and ostensibly private actors who work in concert to eliminate whatever speech they deem undesirable.



A true and correct copy of a graph depicting the roles and relationships of the actors in this network is shown above, and is available on https://vashiva.com/wp-content/uploads/2022/12/11889-Exhibit-A-SECOND-AMENDED-COMPLAINT-07-22-c2021.pdf :

62.  The Defendants weaponized the system they developed, including through their respective close relationships with Twitter, to ensure the deletion of Dr. Shiva's September 25, 2020 screenshot tweets and the eventual decision to deplatform Dr. Shiva from Twitter on February 1, 2021. Twitter's suspension of Dr. Shiva continued through December of 2022.

63. Beginning in 2017, CISA and State Actor Defendants together with a host of others began to develop a theory and system for regulating speech on social media which various government actors, with the support of non-governmental groups, concluded were alleged "misinformation" or "disinformation."

64. In October 2017, the Election Infrastructure Government Coordinating Council ("EI-GCC") was formed with a stated purpose of seeking to ensure the integrity of elections. Defendants would sit on the EI-GCC's Executive Committee and the EI-GCC, respectively. Among other things, the EI-GCC evaluated the means by which to regulate and censor speech on social media platforms.

65. In extra-governmental roles, Defendants have been consistent contributors to the leading policy documents on the regulation and censorship of speech on social media platforms, namely the collective "Playbooks" published by the Harvard Kennedy School's Belfer Center which have been the foundation for government regulation and censorship of speech on social media. Notably, Eric Rosenbach ("Rosenbach"), Former Chief of Staff at the Pentagon and Co-Director of the Belfer Center, is listed as the lead author on each of these

documents.

66. The first of these Playbooks was intended directly for CISA's EI-GCC, the Election Cyber Incident Communication Coordination Guide. That guide focused on coordination of communications among election officials in response to cyber attacks. Defendants contributed to the creation of that document, a true and correct copy of which is available here: https://vashiva.com/election-cyber-incident-communications-coordination-guide/

67. Defendants were similarly listed as contributors to the Belfer Center's "The State and Local Election Cybersecurity Playbook." A true and correct copy of that document is here: https://vashiva.com/state-local-election-cybersecurity-playbook/. That Playbook articulated the view of myriad threats to elections, despite the decentralized nature of election systems in the United States, and sought to highlight potential strategies for guarding against cyber-attacks.

68. Defendants also developed the manuals establishing the "best practices" for how government actors, and particularly for how election directors, should conceptualize and respond to speech about elections on social media platforms, namely Parts 1 and 2 of the "Election Influence Operations Playbook" (the "Playbook"). True and correct copies of each part of the Playbook are here https://vashiva.com/election-influence-operations-playbook-part-1/, https://vashiva.com/election-influence-operations-playbook-part-2/. These Playbooks were published shortly before Dr. Shiva's September 24 and 25 tweets.

69. Part 1 of the Playbook describes so-called "Influence Operations," schemes by which certain individuals attack the integrity of elections as acts of war through coordinated schemes of disinformation and misinformation about elections. Part 1 of the Playbook identified the species of speech to be regulated not exclusively as such frontal attacks by antagonistic state actors, however, but also highlights the need to censor even "[i]naccurate

information spread in error without malicious intent."

70. The explicit mission of the Playbook is to facilitate censorship of disinformation or misinformation. Id. Of course, the government actors who undertake the strategies and methods set out in the Playbook must themselves make the determination as to what speech on social media platforms constitutes "disinformation" or "misinformation." As a result, in implementing the Playbook, Government actor Defendants, and others must themselves make the determination about what speech, including political speech, they consider problematic.

71. The authors of the Playbook boast that the Playbook:

connects you to organizations that can support your process, like the Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS), the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC), the Federal Bureau of Investigation (FBI), the National Association of Secretaries of State (NASS), and ***the National Association of State Election Directors (NASED)***. Id. (emphasis supplied).

72. Part 2 of the Playbook particularly lays out a "Mis/Disinformation Response Plan," including identifying alleged threats like Dr. Shiva and how to briskly identify and respond to such threats

73. The Playbook emphasizes that election officials must act to remove any information that they believe may cause a threat to elections, even if that information is allegedly only inaccurate: "For election officials, any incorrect information, regardless of source or intention, presented to voters can pose a threat to elections, because it can undermine voters' understanding of trust in the election." Playbook, Part 2, at 2 (emphasis in original). In other words, the Playbook, authored by Defendants among others, endorses removing any speech that an election official—a government actor—believes to be inaccurate, even where the speech is political in nature.

74. In identifying alleged "misinformation" or "disinformation" to which election officials

should be particularly attuned, the Playbook identifies people that "[i]mpersonate or disparage the people that run elections." Id. at 17. Thus, government officials are advised to censor members of the public who might "disparage" them. As an example of purportedly problematic speech, the Playbook specifically identifies criticism of government officials running elections such as "The people who run elections are corrupt."  In so doing, the Playbook strikes at the very heart of free speech protections, which protect the right of every individual to criticize the government.

75. The Playbook explicitly advises government officials to report allegedly problematic speech both to social media platforms like Twitter and also to report to the Elections Infrastructure Sharing and Analysis Center ("EI-ISAC"), which in turn "is able to route reports through a network of collaborators including CISA, the FBI, and other federal authorities." Id. at 23.

76. As to Twitter in particular, the Playbook explains that Twitter has a special reporting tool for election officials known as the "Partner Support Portal (PSP)," which "expedites the review of content flagged for potentially violating Twitter's rules around civic events." Id. at 46.

77. Part 3 of the Playbook, which is not publicly available but rather disseminated solely to election officials, sets out particularized tactics and strategies for election official to respond to what is viewed as "misinformation" or "disinformation."

78. Even beyond the creation of the Playbooks, Defendants strongly advocated for the creation of what is now the government agency most closely tethered to the regulation and censorship of speech on social media. In Congressional testimony in March of 2018, CISA Defendants spoke in favor of the creation of the CyberSecurity and Infrastructure Security Agency ("CISA"). In that testimony, they sat alongside Rosenbach, who referred to CISA Defendants as "strong allies" of the Belfer Center.

79. CISA Defendants were crucial to the creation of the EI-ISAC within the Center for Internet Security ("CIS"), a non-governmental entity funded by billionaire Pierre Omidyar, as the singular conduit between local and state officials and social media companies for alleged misinformation and disinformation, and as the conduit for information to be sent to the Elections Integrity Project ("EIP") funded by the Atlantic Council (funded by the British government) for analysis on behalf of CISA.

80. CISA Defendants are integrated in a host of other governmental and ostensibly private organizations in the cyber security space. Among other things, some Defendants are member of the Advisory Group for the Global Cyber Alliance which brings in funding from British government entities and private parties.

81. In the same way CISA Defendants have been integral in creating and implementing the combination of government and non-government actors to regulate free speech and some sit on the US Election Assistance Commission, the Executive Committee of CISA's Election Infrastructure Government Coordinating Council (EI-GCC), the Bi-Partisan Policy Center's Elections Task Force, Member of the Overseas Voting Initiative of the Council of State Governments, and Advisory Board Member of the MIT Elections Data and Science Laboratory.

82. Even beyond growing the ecosystem of organizations by which speech on Twitter and other social media platforms is regulated and censored by government actors, Defendants have particularly coercive influence over Twitter as a result of the roles they hold within the network of agencies that regulate and censor speech on social media platforms.

83. More particularly, CISA Defendants have especially close ties and coercive influence over Twitter's legal team, with whom they authored the Playbook. As just a single example, Defendants and Stacia Cardille of Twitter's legal team, were all at NASED's Winter

Conference held on February 1-5 2021, when Twitter deplatformed Dr. Shiva. Among other things, some CISA Defendants invited Twitter's Stacia Cardille, Associate General Counsel, to give a talk on "Managing Misinformation on Social Media Platforms" at that conference.

84. Twitter is vulnerable to the coercive power of the system the other Defendants developed. Indeed, the very significant influence which Defendants have accumulated within the network of actors. Twitter is well-aware that CISA Defendants have the ability to mobilize the network of government regulators against Twitter if Twitter does not comply with their requests to censor speech.

85. Further, for years, all social media companies have been under tremendous pressure to act against "election disinformation." This pressure has been unrelenting and from all sides: Congress, state politicians, DOJ, the press and public opinion. It never let up after the previous 2016 elections. In October 2020, Massachusetts U.S. Senator Edward Markey demanded in the Senate that FaceBook and other social media companies actively shut down voices that he deemed to be peddling "election misinformation."

86. Twitter, as a publicly traded corporation, is susceptible to these strong pressures. Where any allegation that Twitter might promote or tolerate election misinformation would strike a blow to its valuation, Twitter is particularly vulnerable to the coercion of government actor like Tassinari who might allege that a tweet constitutes election misinformation or disinformation.

87. CISA Defendants are Twitter Trusted Partners, which means that each has access to a preferential Partner Support Portal ("PSP") entitling them to preferential treatment and response times to any complaints they may make.

88. Ultimately, Dr. Shiva would come face-to-face with the tools the Defendants built to censor political speech on social media platforms when he ran for U.S. Senate in Massachusetts.

B. **Dr. Shiva Makes the United States his Home and Builds a Career in the Sciences as Well as a Strong Candidacy for U.S. Senate**

89. Long before the Defendants conspired to censor speech on social media, Dr. Shiva was born in India in 1963 into India's oppressive caste system as a low-caste untouchable. The oppressive conditions and the corrupt system of socialist governance in India motivated his parents to immigrate to the United States in 1970 to seek greater liberty and respect for individual rights, including the U.S. Constitution's iron-clad protection for freedom of speech, as well as opportunities for themselves and their children.

90. Dr. Shiva earned four (4) degrees from the Massachusetts Institute of Technology: a bachelor's in Electrical Engineering and Computer Science, two masters degrees - one in Mechanical Engineering and the other in Visual Studies - as well as a doctoral degree in Biological Engineering.

91. Dr. Shiva is a Fulbright Scholar, a Westinghouse Honors Award recipient, a member of multiple research and engineering academic honor societies including Eta Kappa Nu, Sigma Xi, and Tau Beta Pi, a Lemelson-MIT Awards Finalist, and was nominated for the National Medal of Technology and Innovation bestowed by the President of the United States.

92. As an educator, Dr. Shiva has developed new curricula and taught at both undergraduate and graduate levels at MIT and has presented invited lectures at leading academic institutions across the world.

93. In addition Dr. Shiva is responsible for seven (7) start-up technology companies and presently runs a biotechnology company, CytoSolve; an educational institute, Systems Health; an artificial intelligence company, EchoMail; and, a not-for-profit research center,

International Center for Integrative Systems. Justia's list of Dr. Shiva's patents is at https://patents.justia.com/inventor/v-a-shiva-ayyadurai

94. Dr. Shiva has a long personal history of political activism including, among other things, speaking out publicly about a myriad of issues. After leading a 5,000-person strong protest against apartheid in South Africa, he burned the South African flag on the steps of MIT. He has organized and led protest in support of fair wages for food service workers. Indeed, he has led hundreds of protests in Massachusetts on issues ranging including, among other issues, election integrity, digital rights for all, and clean food.

95. Though he never experienced government regulation of his free speech rights in the United States until the events described in this Complaint, the government of India did strike against him in retaliation for his political speech. He authored a document entitled "Innovation Demands Freedom," which detailed corruption in the Indian-government run scientific organizations and which the prestigious journal *Nature* published. The Indian government successfully pressured *Nature* to take down the article, however, in order to silence Dr. Shiva's detailed reports of corruption.

96. As part of his consistent exercise of his free speech rights, in August of 2011, Dr. Shiva opened his Twitter account, **@va_shiva**, to build an independent base and reach local, national and global audiences to support his activism in various scientific, social and governance causes. This Twitter account also served as his primary platform to communicate with potential voters during his runs for political office. It is vital for this court to note that as a private citizen, this Twitter account represents the speech of a private individual even during a run for political office.

97. Between August 2011 and August 2020, Dr. Shiva had grown his Twitter audience from zero to a quarter of a million people who regularly heard what he had to say on diverse

political topics important to him, and interacted with him online. At the time of his deplatforming on February 1, 2021, he had 360,000 people following him on Twitter.

98. In February 2017, as a natural outgrowth of his longstanding political activism, Dr. Shiva decided to run for the U.S. Senate as an Independent candidate principally in order to seek to bring integrity and accountability to government. Ultimately, Dr. Shiva lost to incumbent Senator Warren in the 2018 campaign.

**C.  Dr. Shiva Disputes the Results of the Massachusetts Republican Primary for U.S. Senate, Including Based Upon the Commonwealth's Destruction of Electronic Ballots in September of 2020**

99. Dr. Shiva ran for U.S. Senate again in 2020, this time as a Republican.

100.   Through his campaigns, Dr. Shiva had built a movement of millions of people in Massachusetts and across the United States, including 3,000 volunteers on the ground in Massachusetts. Utilizing Twitter, Dr. Shiva raised over $1 million in support of his political campaign.

101.   Ironically, given the events detailed in this lawsuit, Dr. Shiva's platform was based upon, among other things, election integrity and free speech. His campaign slogans, which he consistently utilized on Twitter as hash tags, were #StopElectionFraud and #TruthFreedomHealth.

102.   Dr. Shiva began his run for U.S. Senate against incumbent Senator Edward Markey as a Republican candidate in January 2019.

103.   Dr. Shiva built a ground organization of approximately 3,100 volunteers, distributed approximately 10,000 lawn signs, received donations from about 20,000 people that funded billboards at prominent spots on highways, advertisements on social media, radio and

television, and made "Dr. Shiva" a recognized household name across all 351 cities and towns in Massachusetts. In addition, Dr. Shiva personally crisscrossed the state and held rallies to reach a diversity of demographics. Dr. Shiva's campaign always met or exceeded all regulatory requirements set by the Elections Division at the Office of the Secretary of State.

104.    In February 2020, one year after Dr. Shiva began his campaign, Kevin O'Connor ("O'Connor"), in his first run for political office, entered the Republican primary race. O'Connor had little visibility, only a handful of volunteers, and no real campaign organization.

105.    On September 1, 2020, the Massachusetts Republican primary for U.S. Senate was held. Polling showed that Dr. Shiva was leading in all counties. The announced results showed he had won in Franklin County by nearly ten-percent (10%) over his opponent, but had lost in all other counties by a consistent ratio of approximately 60% to 40%.

106.    Franklin County was the only county that used predominantly paper ballot, in which approximately seventy-percent (70%) of the votes were cast by paper ballot. The rest of the counties primarily used electronic systems that generated digital ballot images, which were then analyzed by a computer program to tabulate vote counts.

107.    Dr. Shiva's campaign filed Public Records Requests to the various counties, under MGL ch. 66, for (a) the list of participating voters – those who actually voted in the election, and (b) the counts of the actual numbers of votes cast. Seven (7) of the fourteen towns/cities provided the records. In all seven (7) towns/cities, the number of tabulated votes was larger than the number of participating voters. Boston had approximately 4,100 more votes than participating voter, and Newton had approximately 1,700 more votes than participating voters. Accessing and analyzing the ballot images – which are in the chain of custody of

tabulating votes – therefore became critical to understanding the root cause of the discrepancy between Franklin County and the other counties.

108.     On September 9, 2020, Dr. Shiva personally went to Secretary Galvin's office to deliver a Public Records Request to the Secretary, under MGL c. 66, to determine whether or not the Secretary of State stored all digital ballot images that are used to tabulate votes when ballots are electronically processed and to request copies of those digital ballot images. In all counties other than Franklin County (where the paper ballots are used for vote tabulation), the majority of paper ballots in the State were simply collected and stored, given the digital ballot images are what are used for tabulating votes in electronic voting machines.

109.     In those counties, which primarily use electronic systems for tabulating votes, the ballot images are the ballots, since the ballot images are the objects upon which tabulation takes place. The ballot scanning machines scan the paper ballots and generate a ballot image, which ballot images are then counted to tabulate the votes in a Federal election, while the paper ballots are merely physically retained and not used.

110.     Pursuant to Federal law, including under 52 U.S.C. Section 20701, Galvin is required to securely store or retain for twenty-two (22) months any and all records generated in connection with an election for a Federal office, such as U.S. Senate.

111.     A video recording reveals that on the same day Dr. Shiva submitted his public records request, September 9, 2020, William Rosenberry, an Elections Division official in Defendant Secretary Galvin's office, told Dr. Shiva that the Secretary possessed "no ballot images" as the Secretary's office "turned that feature off" so as to not save the ballot images, which were generated by the ballot scanners. The default setting on the electronic machines is to save all ballot images so as to be compliant with Federal law. Rosenberry informed Dr. Shiva that he would send him an email documenting Secretary Galvin's position on the matter.

112.     On Monday, September 21, 2020, Dr. Shiva returned in person to Secretary Galvin's office to follow up on the Public Record Request. Dr. Shiva came with storage devices to collect the ballot images. He also documented, in writing, Rosenberry's earlier statement of the deletion of ballot images and further requested, in writing, what information the Secretary's office would be delivering him. Defendant Tassinari was also present at this meeting, and Tassinari informed Dr. Shiva in the presence of Rosenberry that the Secretary's office did not have to respond for ten (10) business days, and told Dr. Shiva that she would respond by the end of the day on Wednesday, September 23, 2020 by email.

113.     On September 24, 2020, at approximately 9:00AM, Dr. Shiva contacted the Secretary's office via telephone and asked where the response to his Public Records request was, as it was due on September 23, 2020. Rosenberry was recalcitrant and after Dr. Shiva informed him that he was in violation of Federal law for not delivering him his records within the ten (10) business days. Rosenberry responded, "No, I'm in violation of State law." At the end of the conversation, Rosenberry assured Dr. Shiva that he would deliver it by 5:00PM that day. Dr. Shiva documented this phone conversation via email, in which he specifically memorialized Rosenberry's admission to having violated Massachusetts State Law.

114.     Within less than thirty (30) minutes of Dr. Shiva's email to Rosenberry that documented Rosenberry's violation of state law, Tassinari responded to Dr. Shiva's request. Tassinari wrote, in part, that "the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images." A true and correct copy of the email chain between Dr. Shiva and Tassinari containing that email is available.

115.     In response, Dr. Shiva asked Tassinari to identify the statute upon which Tassinari relied for the claim that capturing ballot images was "prohibit[ed]." Id. In the following email exchange between Tassinari and Dr. Shiva, Tassinari failed to identify any relevant

statute that supported her contention, but did acknowledge that "the ballot images are not stored." Id. In other words, Dr. Shiva advocated in support of his position that after the electronic system for voting creates an image of a ballot, which image is then used to tabulate votes, the Commonwealth chooses not to maintain that ballot image such that it is destroyed or disappears entirely.

116.     Finally, in a fourth email, Dr. Shiva reiterated his request for Tassinari to identify any statute that supported Tassinari's claim that capturing ballot images was prohibited, and explained that the Commonwealth had violated federal law by failing to maintain images of the electronic ballots. Id.

117.     Tassinari never replied to Dr. Shiva's final, fourth email and did not cite any statute or law that allowed Massachusetts to destroy the ballot images that were generated in connection with a Federal election. Tassinari omitted Dr. Shiva's fourth email from her affidavit (ECF No. 15-2) filed in this matter, a decision that can be construed only as aiming to conceal evidence from this court, given that the fourth email had been posted on Twitter and, as discussed below, was one of the four (4) tweets specifically deleted by Twitter on behalf of the Defendants.

118.     Tassinari's email conversation with Dr. Shiva intended to downplay the critical importance of ballot images in the tabulation process of votes, and in Dr. Shiva's understanding to create a false impression of the preeminence of paper ballots. Elections officials across the country are aware of lawsuits filed by election integrity activists, such as John Robert Brakey (YouTube video: https://www.youtube.com/watch?v=PESVW--fpOI ), seeking transparency in the handling of ballot images by State Elections Directors.

119.     The only possible conclusion is that Tassinari, a practicing attorney, chose the word "capture" in her original email to mislead and misdirect Dr. Shiva and give the false

impression that in Massachusetts ballot images never exist, at all, at any time. The reality is that they are used to tabulate votes. This is supported by the effort expended by both Tassinari and O'Malley to falsely claim, including in press statements, that the paper ballots are saved and so Federal law has been satisfied, as if paper ballots are used to tabulate the vote when electronic machines are used.

**D.  The Defendants Conspire to Retaliate Against Dr. Shiva for Dr. Shiva's Exercise of his Free Speech Rights and their Goal is to Have Him Deplatformed from Twitter**

120.     During the period from September 1, 2020 to September 25, 2020, Dr. Shiva posted a series of tweets specifically on election fraud in Massachusetts, and reiterating his position that Massachusetts had destroyed ballots. Notably, however, none of those tweets specifically identified Tassinari. As a result of those tweets, Twitter neither banned Dr. Shiva's nor forced Dr. Shiva to remove these tweets. True and correct copies of those tweets are available. _.

121.     Among those tweets, on September 24, 2020, Dr. Shiva posted on Twitter that Massachusetts destroys ballot images. Dr. Shiva also posted that in seven (7) Massachusetts cities/towns there were more votes counted than are participating voters, and appended the Twitter hashtag #ElectionFraud to his tweets. This tweet went viral and generated much commentary. It did not, however, identify Tassinari by name or position. A true and correct copy of that tweet is available.

122.     Upon learning of Dr. Shiva's September 24, 2020 tweet, Tassinari instructed O'Malley, who as the Communications Director is the point person in Galvin's office who manages the Election Division's official Verified Twitter account, to report that tweet to Twitter, which O'Malley did.

123.     Tassinari did not take any action to advocate for the removal of the September 24, 2020 tweet other than instructing O'Malley to report that tweet to Twitter.

124.     O'Malley, as the official spokesperson for Galvin, Tassinari and the Elections Division, released statements to the Associated Press, Reuters and Leadstories.com that this tweet constituted "Election Misinformation" and claimed that no ballot was destroyed in violation of Federal law.

125.     Twitter did not delete the September 24, 2020 tweet.

126.     On September 25, 2020, Dr. Shiva followed his September 24, 2020 tweet with a thread of four (4) tweets that revealed, via screenshots, the email conversation with Tassinari contained at Exhibit __, which was written confirmation from the Secretary's own office that records generated during a Federal election – the ballot images - the very records used for tabulation -  were destroyed and "not stored."  A true and correct copy of the thread of four tweets is available.

127.     Unlike the September 24, 2020 tweet, the September 25, 2020 screenshot tweetss identified Tassinari by name and Dr. Shiva relied upon them to support his contention that she and Galvin's office more broadly violated Federal law, including because they included screenshots of Dr. Shiva's emails with Tassinari.

128.     Dr. Shiva's September 25, 2020 screenshot tweetss upset Tassinari, particularly because they identified her by name. She was highly motivated to ensure that the September 25, 2020 screenshot tweetss were removed because they revealed that she personally engaged in problematic conduct.

129.     In contrast to the decision to send out a press release to the media regarding the Commonwealth's position on Dr. Shiva's September 24, 2020 tweet, no one at Galvin's office sent out a press release in response to the September 25, 2020 screenshot tweetss or

otherwise sought to speak publicly to contradict the substance of Dr. Shiva's September 25, 2020 screenshot tweetss. They chose not to combat what they considered "bad speech" with "good speech."

130.    Tassinari testified under oath at the October 30, 2020 hearing in this matter that she did not report the September 25, 2020 screenshot tweetss to Twitter, did not ask O'Malley to do so, and did not do anything else to cause the September 25, 2020 screenshot tweets to be reported to twitter. Oct. 30 Tr. at 53:24–54:14, a true and correct copy of which is available.

131.    Contrary to Tassinari's testimony that she did not do anything to cause the September 25, 2020 screenshot tweetss to be reported to Twitter, Tassinari—at a time when she was the President-elect of NASED—communicated directly with NASED Executive Director Cohen in the hope that Cohen would report Dr. Shiva's September 25, 2020 screenshot tweets to Twitter. By coordinating with Cohen she hoped to amplify pressure on Twitter to punish Dr. Shiva for his tweets about her emails, and hoped that doing so would cause Twitter to suspend his account such that he could not tweet at all during his election campaign for the official reason of "Election Misinformation."

132.    Tassinari's decision to use Cohen and NASED as an intermediary to submit a complaint about Dr. Shiva's September 25, 2020 screenshot tweets was consistent with the unconstitutional principle in the Playbook that election directors should seek to censor speech on social media that "disparage[s] the people that run elections." Id. at 17. Tassinari also chose this route in order to avoid creating a public record.

133.    NASED, via Cohen did report Dr. Shiva's September 25, 2020 screenshot tweetss to Twitter through the Partner Support Portal. Indeed, the Declaration of Stacia Cardille reveals

that Twitter learned of the September 25, 2020 screenshot tweetss through a report from NASED through the Partner Support Portal.

134.     NASED made its report based upon the allegations that Tassinari supplied to Cohen.

135.     NASED's report to Twitter contained contentions that mirrored Tassinari's position:

[The Tweet] is incorrect. Massachusetts does not, and did not, destroy ballots. The voting equipment used in Massachusetts does not store images of the ballots, and Massachusetts stores physical copies of the paper ballots consistent with federal laws. This person doesn't understand that the images are not the ballots of record, the physical ballots are the records, which Massachusetts retains for 22 months. Id. ¶14.

136.     As a direct result of NASED report via Cohen that Tassinari prompted, Twitter caused the removal of the September 25, 2020 screenshot tweets and repeatedly locked Dr. Shiva out of his Twitter account until November 4, 2020, the day after the general election.

137.     After Cohen reported back to Tassinari that her directive had been followed, Tassinari went on Twitter to verify the September 25, 2020 screenshot tweets had been deleted, and "was relieved" to see that Twitter indeed had removed them.

138.     As a direct result, of the other Defendants' coercive conduct described above, Twitter continued to monitor Dr. Shiva's tweets.

139.     Dr. Shiva continued to run his campaign. On October 4, 2020 his access to Twitter was restored. Dr. Shiva posted tweets about the rallies he had held, his objections to election fraud and the destruction of ballot images. Those tweets remain public.

140.     Twitter did not censor Dr. Shiva or to any of his tweets until February 1, 2021.


**E.  The Defendants Succeed in Forcing Twitter to Deplatform Dr. Shiva on February 1, 2021**

141.     On February 1, 2021, Dr. Shiva through a video lecture published on Twitter the September 25, 2020 screenshots tweets to educate his students on developments in his lawsuit.

142.     Dr. Shiva's video lecture including the September 25, 2020 screenshot tweets concluded at 9:31 PM on February 1, 2021.

143.     At 9:48 PM, just seventeen minutes after the conclusion of the video lecture posted on Twitter containing the September 25, 2020 screenshot tweets, Twitter emailed Dr. Shiva to announce that he had been suspended permanently, i.e., deplatformed. That email, a true and correct copy of which is attached here as <u>Exhibit</u> ___ stated clearly, "Your account va_shiva has been suspended for violating the Twitter Rules." That email, a true and correct copy of which is available, and stated clearly in the subject line, "Your Twitter account has been suspended," and warned him that "…if you attempt to evade a permanent suspension by creating new accounts, we will suspend your new accounts."  Dr. Shiva appealed the suspension through Twitter's internal appeal process and received no response, until April 9, 2021, after Twitter was named a proposed Defendant in this lawsuit, and was served with a Motion for Joinder.

144.     Twitter never undertook any independent review of Dr. Shiva's at-issue tweets.

145.     In the seventeen minutes between the conclusion of Dr. Shiva's video lecture and Twitter's announcement that Dr. Shiva's account had been suspended there was insufficient time for any purportedly independent review.

146.     Twitter suspended Dr. Shiva's account at the behest of the other CISA Defendants and as a result of the coercive influence that state actors working with CISA Defendants and others had and continue to have over Twitter.

147.     Twitter's suspension of Dr. Shiva continues until December of 2022.

148.     Leading up to September 25, 2020 and following the conclusion of Twitter's initial suspension of Dr. Shiva, Dr. Shiva tweeted on a host of highly controversial topics, including, among others, a tweet "The #DeepState created #[Black Lives Matter] to distract

34

US from uniting Working People," another criticizing COVID-19 vaccinations and stating that COVID-19 is a fraud, and—critically—many other tweets asserting election fraud in Massachusetts. True and correct copies of those tweets are available.

149.     Twitter did not discipline Dr. Shiva in any respect for any other of his highly controversial tweets, in stark contradiction to the Tweets that specifically identified Tassinari.

150.     The choice of Twitter not to discipline Dr. Shiva for his controversial tweets further demonstrates that Twitter suspended Dr. Shiva as a direct result of the other Defendants coercion of Twitter, and not for any other reason.

### F.   **The Defendants Misrepresented that they Solely Reported Dr. Shiva's September 24, 2020 Tweet through Twitter's Ordinary Portal.**

151.     The Defendants in this case, both in affidavits and through counsel, have sought both through material omissions and affirmative misrepresentations to conceal their conspiracy to censor Dr. Shiva. Their consistent cooperation in doing so confirms the extent to which Twitter is coerced and strongly encouraged by and cooperates with the other Defendants.

152.     The Defendants' failed attempts to conceal that conspiracy have confirmed the extent to which all the Defendants continue to work together to seek to ensure the censorship of Dr. Shiva.

153.     The government Defendants in this case endeavored to conceal their particularly coercive power over Twitter, despite themselves developing the well-articulated plan for how to respond to purported misinformation and disinformation and holding positions of particular influence enabling them to coerce Twitter.

154.     The Defendants initially took the firm position that they did nothing but report a single tweet of Dr. Shiva, the September 24, 2020 tweet, as being false "just as any person could have done." Opposition to Plaintiff's Motion for an Emergency Temporary Restraining Order.

35

155.     None of the Defendants disclosed to this the existence of the Playbook. To the contrary, they initially asserted that each of them had done nothing but report Dr. Shiva's tweets to Twitter as any ordinary member of the public might do.

156.     O'Malley swore in her October 29, 2020 affidavit that she simply reported Dr. Shiva's September 24, 2020 tweet "as false, using the mechanism within Twitter for reporting Tweets that violate the terms and conditions of that platform."

157.     Tassinari, as well, chose not to disclose to the Court in her October 29, 2020 affidavit that Galvin's office is a Twitter Trusted Partner that receives preferential treatment when it reports tweets. ECF No. 15-2.

158.     Both O'Malley and Tassinari swore that O'Malley's report of Dr. Shiva's September 24, 2020 tweet was "the one and only time I, or to my knowledge, anyone in my office, has reported one of Ayyadurai's Tweets to Twitter for any reason." ECF No. 15-1, ¶9; ECF No. 15-2, ¶11. However, Tassinari did report the September 25, 2020 screenshot tweets identifying her in particular to Cohen at NASED, without filing a complaint directly through Twitter. She did this in order that Cohen, who speaks for NASED, could complain to Twitter on Tassinari's behalf.

159.     The October 30, 2020 evidentiary testimony before this Court revealed that O'Malley and Tassinari had each chosen not to include in their affidavits the special relationship that Galvin's office enjoys with Twitter and with NASED.

160.     At that hearing O'Malley revealed for the first time that Galvin's office as well as NASED enjoy preferential treatment in reporting complaints about tweets to Twitter as a "Twitter Trusted Partner." October 30, 2020 Hearing Transcript, a true and correct copy of which is available. As a Twitter Trusted Partner, Twitter looks at reports from the Massachusetts Elections Division "quickly" because they are "Aware of which accounts are election official accounts."

161.     As the Court put it following O'Malley's testimony when describing the process by which the Defendants reported Dr. Shiva's tweets, "I now know that not only did Secretary Galvin's office report this complaint about [the tweet], but it was through an account that they and their colleagues

around the country had been assured would get priority attention and that the executive director of the national organization [Cohen], as Secretary Galvin hoped, also filed a report, and the hope was that the tweet would be deleted." Transcript of October 30, 2020 Hearing, 80:7–15. While the September 24, 2020 tweet was not deleted, "Four others were, and there's no evidence that there's any other reason the others [from September 25, 2020] were deleted." Id. at 80:16–17.

162.    The October 30, 2020 hearing further revealed that, contrary to her sworn affidavit, Tassinari caused the September 25, 2020 screenshot tweets to be deleted and was "relieved" that they had been removed. In particular, Tassinari testified that she checked to see if Dr. Shiva's tweet relating to her had been removed and was "relieved" when she saw that it was. Id. at 73:12–23. Only the September 25, 2020 screenshot tweets were deleted—not the September 24, 2020 tweet—so the only reason for Tassinari to have been relieved was that the September 25, 2020 screenshot tweets that included her emails with Dr. Shiva had been deleted.

163.    The Affidavit of Stacia Cardille, Director and Associate General Counsel for Twitter, reveals the extent to which Twitter was willing to go to conceal its participation in the conspiracy to censor Dr. Shiva. See ECF No. 96.

164.    Cardille claims that Twitter suspended Dr. Shiva's account as a result of multiple tweets upon with Twitter acted. However, review of the complete set of tweets reveals that he sworn statements are inaccurate.

165.    Although Twitter suspended Dr. Shiva on February 1, 2021, Cardille falsely claimed in her sworn affidavit in this matter that Twitter did not suspend Dr. Shiva's account until a full two days later on February 3, 2021. ECF No. 96, ¶23. More particularly, Cardille's sworn statement that Dr. Shiva's "suspension took effect on February 3, 2021," id., is directly contradicted by Twitter's February 1, 2021 email to him stating that his account "has been suspended."

166.    The demonstrably false claim of Cardille that Twitter did not suspend Dr. Shiva until February 3, 2021 demonstrates the lengths to which Twitter will go to claim it exercises independent

judgment rather than simply responding to the demands of government actors with disproportionate influence, like Tassinari.

167.     For example, while Cardille claimed that two January 17, 2021 tweets of Dr. Shiva violated Twitter's rules such that Twitter locked Dr. Shiva's account, the reality is that Twitter did not lock Dr. Shiva's account. Rather, he continued to tweet on that same date.

168.     Bizarrely, on the basis of *Facebook* posts—***not tweets*** on Twitter—Cardille further swore that Dr. Shiva violated Twitter's rules.

169.     In response to Dr. Shiva's articulation of the respects in which Cardille's original affidavit (ECF No. 96) was false, Cardille submitted a supplemental affidavit. In that supplemental affidavit (ECF No. 100) she conceded that Twitter had "reviewed" the February 1, 2021 tweets "shortly before" 9:48 PM, when Twitter sent the email to Dr. Shiva announcing that his account "has been suspended." Cardille further claimed that, despite the technological prowess of Twitter, Twitter had inadvertently concluded that it had suspended Dr. Shiva's account on February 3, 2021. Id. ¶4. In fact, as Twitter now concedes through Cardille, Twitter suspended Dr. Shiva's account "immediately" after the Twitter employee saw it.

170.     The coordinated efforts of the Defendants to coverup their collusion.

**G.   Analysis of Regulation of Purported Misinformation Confirms Censorship of Dr. Shiva.**

171.     On June 15, 2021, a group known as the Election Integrity Partnership published a report describing purported misinformation in the 2020 election which highlighted Dr. Shiva, titled as "The Long Fuse: Misinformation and the 2020 Election." A true and correct copy of that report is available.

172.     The Long Fuse report highlights, consistent with the efforts of the Defendants to regulate and censor speech on social media platforms, that no federal agency has an explicit focus on "election misinformation originating from domestic sources." Id. at v. Indeed, the

Long Fuse report laments, consistent with the Defendants' efforts, that "disinformation that originates from within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." Id. at 2.

173.    Published several months after Dr. Shiva was suspended from Twitter, the Long Fuse report devotes substantial attention to Dr. Shiva and identifies him as a purveyor of electoral misinformation who must be censored.  The Long Fuse Report identifies Dr. Shiva along with five others as the TOP SIX REPEAT SPREADERS on Social Media.  The others included Donald Trump, Breitbart, Newsmax, Gateway Pundit, James O'Keefe – all who had received substantial funding from outside sources.  Dr. Shiva's followers were organically and independently developed.  Id. at 203.

174.    Conspicuously, the Long Fuse report omits any mention of the Defendants censorship of Dr. Shiva but instead devotes itself to further advocating for regulating and censoring him based upon what it concluded were "dubious" arguments. Id.

175.    At bottom, the Defendants' censorship of Dr. Shiva reflects the implementation of a determined effort to strip social media platforms of any speech that government actors working with ostensibly private actors view as "dubious" or problematic.

**H.   Dr. Shiva is Put Back on Twitter in December 2022. The Defendants Retaliate by Putting Dr. Shiva in a "Digital Cage" When He Exposed the Existence of the Censorship Infrastructure. In a Coordinated Fashion, ALL Social Media Companies Censored Dr. Shiva's Speech by Algorithmically Restricting His Reach and Re-Directing His Followers to His Opponents.**

176.    On December 2022, Dr. Shiva was put back on Twitter, fully aware that the Government's Backdoor Censorship Portal was still in place. In April of 2023, Dr. Shiva became a Candidate for U.S. President.  He was to find that a new censorship was now

underway, where he was placed in a "Digital Cage" and his followers were being re-directe

to his opponents e.g. Robert F. Kennedy, Vivek Ramaswamy, etc. social media posts.

177.    His first post on Twitter was to request Elon Musk if he could be the Twitter CEO as

shown here:



178.    That tweet went viral to millions garnering 11,000 retweest and 11 MILLION views,

garnering news stories across the globe.

179.    However, after Dr. Shiva began once again criticized Elon Musk for not removing CISA's

Backdoor Censorship Portal into Twitter and other Social Media Companies, and relentlessly

exposing the existence of this Infrastructure, his reach diminished from hundreds of millions of

views per day to a mere thousands per day as shown in this graph:



ELON MUSK CENSORS DR.SHIVA's TWEETS ON GOVT BACKDOOR PORTAL

December 2022 - February 2023

| DATE | IMPRESSIONS (SEEING DR.SHIVA TWEETS) / DAY | TWEETS EXPOSING MUSK NOT SHUTTING DOWN GOVT BACKDOOR PORTAL |
|---|---|---|
| DECEMBER 2022 | 462000 | 4 |
| JANUARY 2023 | 350000 | 9 |
| FEBRUARY 2023 | 65000 | 15 |

180.     The Defendants were continuing their censorship of Dr. Shiva under the pretext that Elon Musk was now their champion of "Free Speech" and misrepresenting that Twitter was now a space for free speech.  The fact is Mr. Musk is a government actor and his existence and wealth come at the behest of the Defendants.  "Where Elon Musk ends and government begins nobody knows," as Dr. Shiva asserted on multiple tweets

181.     On other social media platforms, You Tube and Facebook, the Defendants coordinate to contain Dr. Shiva's followers. His followers have not grown at all concomitant with the massive amount of content he shares.  He receives constantly messages that his posts are "shadowbanned;"  when his posts are liked they are removed; notifications set to receive news of his posts are never received, etc.  In short, Dr. Shiva's reach is massively limited – a new form of censorship.

182.    In addition, using modern predictive analytics and machine learning tools e.g. artificial intelligence, Dr. Shiva's followers are redirected to his opponents social media posts and videos.

183.    In short, nothing has changed except a far more insidious form of censorship.  Earlier, in February 1, 2021, they outright deplatformed Dr. Shiva. Now they allow him on social media, but coordinate to contain his presence.  This new form of censorship more dangerous than the previous for it gives the illusion that government actors like Elon Musk are champions of Free Speech that has been restored, when in fact the opposite is true: CISA is out of control, and must be stopped from violating the First Amendment.

184.    This lawsuit provides the Courts to take action independent of waiting for Congress, which is compromised.

**CLAIMS FOR RELIEF**

**COUNT ONE – VIOLATION OF THE FIRST AMENDMENT**
**Against All Defendants**

185.    All foregoing Paragraphs are incorporated as if set forth fully herein.

186.    Congress is prohibited per the First Amendment from making laws "abridging the freedom of speech."  U.S. CONST. amend. I.  All branches of the federal government are restricted by this prohibition. *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017).

187.    Every State's Constitution also has provisions for similar protection for free-speech rights.

188.    Social Media platforms are the "the modern public square." *Packingham*, 137 S. Ct. at 1737. They  provide "perhaps the most powerful mechanisms available to a private citizen

to make his or her voice heard." *Id.* They also allow WE THE PEOPLE to communicate with public and elected officials.

189.    Social Media is also similar  to telecommunications carriers and/or other  public vehicles  that, under longstanding statutory and common-law doctrines, must be  subject to rules against discrimination in accessing them that discrimination on the basis of content and viewpoint violates.

190.    "Historically, at least two legal doctrines limited a company's right to exclude." *Knight First Amendment Institute*, 141 S. Ct. at 1222 (Thomas, J., concurring). "First, our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Id.* "Second, governments have limited a company's right to exclude when that company is a public accommodation. This concept—related to common-carrier law— applies to companies that hold themselves out to the public but do not 'carry' freight, passengers, or communications." *Id.* Absent the artificial immunity created by the overbroad interpretations of Section 230 immunity, these legal doctrines—along with private and free-market forces—would impose a powerful check on content- and viewpoint-based discrimination by social-media platforms. *See id.*

191.    As alleged further herein, through Section 230 immunity and other actions, the federal government has abrogated these legal restraints on social-media censorship; it has artificially subsidized, encouraged, and enabled the emergence of a small group of immensely powerful social-media companies; and it has conferred on that cartel powerful legal shields protecting its ability to censor and suppress speech on social media based on content and viewpoint with impunity.

192.     As alleged further herein, Defendants have coerced, threatened, and pressured social-media platforms to censor disfavored speakers and viewpoints by using threats of adverse government action, including threats of increased regulation, antitrust enforcement or legislation, and repeal or amendment of Section 230 CDA immunity, among others.

193.     As alleged further herein, Defendants also hold out the "carrot" of continued protection under Section 230 and antitrust law, and thus preserving the legally favored status of social-media platforms. Commentators have aptly summarized this carrot-stick dynamic: "Section 230 is the carrot, and there's also a stick: Congressional Democrats have repeatedly made explicit threats to social-media giants if they failed to censor speech those lawmakers disfavored." "Facebook and Twitter probably wouldn't have become behemoths without Section 230." "Either Section 230 or congressional pressure alone might be sufficient to create state action. The combination surely is."

194.     As alleged further herein, as a result of such threats and inducements, Defendants are now directly colluding with social-media platforms to censor disfavored speakers and viewpoints, including by pressuring them to censor certain content and speakers, and "flagging" disfavored content and speakers for censorship. Defendants have thus engaged in joint action with private parties and acted in concert with private parties to deprive Plaintiff. and Americans of their constitutional rights under the First Amendment and related state-law rights.

195.     Defendants' actions constitute government action for at least five independently sufficient reasons: (1) absent federal intervention, common-law and statutory doctrines, as well as voluntary conduct and natural free-market forces, would have restrained the emergence of censorship and suppression of speech of disfavored speakers, content, and viewpoint on social media; and yet (2) through Section 230 of the CDA and other actions,

the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint; (3) such inducements as Section 230 and other legal benefits (such as the absence of antitrust enforcement) constitute an immensely valuable benefit to social- media platforms to do the bidding of federal government officials; (4) federal officials—including, most notably, Defendants herein— have repeatedly and aggressively threatened to remove these legal benefits and impose other adverse consequences on social-media platforms if they do not increase censorship and suppression of disfavored speakers, content, and viewpoints; and (5) Defendants herein, conspiring and colluding both with each other and social-media firms, have directly coordinated with social-media platforms to identify disfavored speakers, viewpoints, and content and have procured the actual censorship and suppression of them on social media. These factors, considered either individually or collectively, establish that the social-media censorship alleged herein constitutes government action. These actions have dramatically impacted the fundamental right of free speech in America, both on social media and elsewhere.

196.    As alleged herein, Defendants have acted in concert both with each other, and with others, to violate the First Amendment and state-level free speech rights.

197.    Defendants' actions violate the First Amendment and analogous state constitutional protections. The First Amendment is violated where, as here, "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring). "The government cannot

accomplish through threats of adverse government action what the Constitution prohibits it from doing directly." *Id.*

198.    The censorship and suppression of speech that Defendants have induced social-media platforms to impose on disfavored speakers, content, and viewpoints constitute forms of prior restraints on speech, which are the most severe restrictions and the most difficult to justify under the First Amendment. "One obvious implication of" the First Amendment's text "is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

199.    These actions have injured and continue to injure Plaintiff, as well as other States' citizens, both speakers and users of social media, and they have injured Americans who do not use social media by their predictable effect on the availability of information through social-media users, who often repeat or communicate information presented on social media to non-users.

200.    These actions have also injured and continue to injure Plaintiff, as well as other States' citizens, by broadly chilling the exercise of free-speech rights on social-media platforms. This injures the First Amendment and state-level rights of all citizens, both users and non-users of social media, by reducing the availability of free speech in a free marketplace of ideas. Much social-media speech is available to non-users of social media on the internet, and social-media users convey speech and information learned on social media platforms to non-users of social media through many other means. Suppressing speech on social media, therefore, directly impacts the First Amendment rights of non-social media users, as well as users.

201.     Defendants' interference with First Amendment and state free-speech rights of Plaintiff and virtually Americans is *per se* unconstitutional, and even if not, it cannot be justified under any level of constitutional scrutiny.

202.     Defendants' interference with First Amendment rights of Plaintiff and virtually all Americans also interferes with rights that the States guaranteed to them under their respective state constitutions. Defendants' interference thus undermines the system of rights the States provided to their citizens, effectively limiting the reach of each State's fundamental law and thwarting the fundamental policies of each sovereign State.

203.     Defendants' conduct inflicts imminent, ongoing, and continuing irreparable injury on Plaintiffs, as alleged further herein.

204.     This Court has inherent authority to declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of federal law, including the First Amendment. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015)

## COUNT TWO – ACTION IN EXCESS OF STATUTORY AUTHORITY
### Against All Defendants

205.     All foregoing Paragraphs are incorporated as if set forth fully herein.

206.     No federal statute authorizes the Defendants' conduct in engaging in censorship, and conspiracy to censor, in violation of Plaintiff's and Americans' free-speech rights.

207.    "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  Agency actions that exceed the agency's statutory authority are *ultra vires* and must be invalidated.

208.    No statute authorizes any Defendants—including but not limited to UNITED STATES OF AMERICA officials, CISA officials, and any other federal officials or agencies—to engage in the course of conduct regarding the censorship and suppression of speech on social media as alleged herein.

209.    No statute authorizes Defendants—including but not limited to to UNITED STATES OF AMERICA officials, CISA officials, and any other federal officials or agencies—to identify what constitutes "misinformation," "disinformation," and/or "malinformation" in public discourse on social-media platforms; to direct, pressure, coerce, and encourage social-media companies to censor and suppress such speech; and/or to demand that private companies turn over information about speech and speakers on their platforms in the interest of investigating "misinformation," "disinformation," and/or "malinformation."

210.    Further, the interpretation of any statute to authorize these actions would violate the non-delegation doctrine, the canon of constitutional avoidance, the major-questions doctrine, the Supreme Court's clear-statement rules, and other applicable principles of interpretation. No statute may be properly construed to do so.

211.    Defendants and the federal officials acting in concert with them, by adopting the censorship policies and conduct identified herein, have acted and are acting without any lawful authority whatsoever, and without any colorable basis for the exercise of authority. No federal statute, regulation, constitutional provision, or other legal authority authorizes their social-media- censorship program, and it is wholly *ultra vires*.

**COUNT THREE – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**Against the UNITED STATES GOVERNMENT, CISA Defendants**

212.     All foregoing Paragraphs are incorporated as if set forth fully herein.

213.     Defendants UNITED STATES GOVERNMENT, CISA,  Easterly, collectively herein as the "US and CISA Defendants."

214.     As set forth herein, the US and CISA Defendants' conduct is unlawful, arbitrary and capricious, an in excess of statutory authority under the Administrative Procedure Act.

215.     The APA authorizes courts to hold unlawful and set aside final agency actions that are found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law…." 5 U.S.C. § 706(2)(A)-(D).  The DHS Defendants' conduct violates all of these prohibitions.

216.     US and CISA Defendants are "agencies" within the meaning of the APA. Defendants Easterly, in their official capacities, is the heads of a federal agency.

217.     The US and CISA Defendants' conduct alleged herein constitutes "final agency action" because it "marks the consummation of the agency's decision-making process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).  Further, it is action from by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id.* Defendants' campaign of pressuring, threatening, and colluding with social-media platforms to suppress disfavored speakers, content, and speech are final agency actions of this sort.  Such actions reflect the completion of a decision-making process with a result that will directly affect Plaintiff, and Americans. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The actions of Defendants alleged herein, on information and

belief, reflect and result from a specific, discrete, and identifiable decision of Defendants to adopt an unlawful social-media censorship program.

218.     The US and CISA Defendants' conduct is arbitrary, capricious, and an abuse of discretion because it was not based on any reasoned decision-making, ignores critical aspects of the problem, disregards settled reliance interests, rests on pretextual *post hoc* justifications, and overlooks the unlawful nature of the US and CISA Defendants' conduct, among other reasons.  5 U.S.C. § 706(2)(A).

219.     The US and CISA Defendants' conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment and state free-speech rights of Plaintiff  and virtually Americans for the reasons discussed herein and in Count One*, supra*.  5 U.S.C. § 706(2)(B).

220.     The  US and CISA Defendants conduct is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because no statute authorizes any of the conduct alleged herein, as discussed in Count Two, *supra*.  5 U.S.C. § 706(2)(C).

221.     The US and CISA Defendants' conduct was "without observance of procedure required by law" because it is a substantive policy or series of policies that affect legal rights that require notice and comment, and yet they never engaged in any notice-and-comment process, or other process to obtain  input  from  the  public,  before  engaging  in  these unlawful  agency  policies.     5  U.S.C. § 706(2)(D).

222.     The US and CISA Defendants' conduct is unlawful under the APA and should be set aside.

**COUNT FOUR – MONETARY DAMAGES UNDER 42 U.S.C. § 1983 FOR VIOLATION OF
A CONSTITUTIONAL RIGHT UNDER THE COLOR OF LAW**

223.     STATE ACTORS and federal actors including UNITED STATES GOVERNMENT

and CISA Defendants colluded through via EI-ISAC, the infrastructure built by Defendants

to intentionally blur the lines between government and the private sector so as to erase "the

gap" created by the First Amendment, which the Defendants and their allies have identified

as a problem. Through EI-ISAC and its own Trusted Partner programs, SOCIAL MEDIA

ACTOORS are inextricably linked with state actors and runs the Partnership solely to provide the

government a stealthy end run around First Amendment restrictions. *Brentwood Acad. v. Tennessee

Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)  It is impossible to tell where Twitter ends and

where the government begins, thanks to Cohen, Rosenbach and allies creating EI-ISAC. This became

an established fact in the record with the discovery of the Playbook and the *Long Fuse Report*.

224.     All Defendants are bound by the very same conspiracy and goal: suppress

dissemination of tweets that reveal official emails that confirm conscious violation of Federal

law. All Defendants coordinated their attack on Dr. Shiva's political speech in conscious,

willful, contemptuous violation of his First Amendment right to the highest protections for

his political speech, especially immediately prior to election day. *Citizens United v. Federal

Election Commission*, 558 U.S. 310 (2010), *Commonwealth v. Melissa Lucas*, 472 Mass. 387

(2015)

225.     Defendants stifled the Plaintiff political candidate's political speech during an

election campaign, especially just prior to election day, based solely on the content of

Plaintiff's speech, violated Federal law when they destroyed records (digital ballot images)

generated in the course of a Federal election, a matter of great public concern, and subject to

court rulings in many other states.

226.     This was *per se* unconstitutional. "It is speech on "matters of public concern'" that is

"at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

227.    The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on SOCIAL MEDIA PLATFORMS during his U.S. Senate election campaign and ongoing harm as of today, caused and causes massive irreparable harm to him as he was/is running for Federal office. Dr. Shiva had built up a following of a several million followers and had a reach that did not require additional expense, compared to advertising on television.

228.    Defendants blocked the candidate from raising public awareness of Defendant's violation of Federal law and the way Defendants violate election integrity, which is a content-based as a restriction on speech by a government actor can get. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), *Citizens*, supra

229.    The Court has ruled that suit for monetary damages from STATE ACTORS for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities by U.S. Citizens and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*, 442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S.  (2017)

230.    The Defendants also took conscious steps to conceal their actions from this court and consciously misrepresented facts in a continuing effort to obstruct justice.

231.    Defendants obstructed justice, *United States v. Dunnigan,* 507 U.S. (1993), and committed a crime which violated their oath and 'laws applicable to his [or her] office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003)

232.    Under established case law, members of a conspiracy are substantively liable for the

foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946)

233.     But for Social Media Companies implementing its Trusted Partnership program in order to help government actors covertly violate citizens' First Amendment rights, this effort to obstruct justice and violate Plaintiff's constitutional rights would not have succeeded.

**COUNT FIVE – CONSPIRACY TO VIOLATE CIVIL RIGHTS - 42 U.S. CODE § 1985**

234.     Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

235.     The "**Ku Klux Klan Act**," enacted as part of the Civil Rights Act of 1871, and now codified as 42 U.S.C. § 1985, provides Dr. Shiva with a private cause of action to seek monetary damages from the Defendants for participating in a conspiracy to violate his First and Fourteenth Amendment rights under the color of law. The Court provided the binding interpretation of this law in *Griffin v. Breckenridge*, 403 U.S. 88 (1971). The reach of this Ku Klux Klan Act encompasses the deprivation of Dr. Shiva's constitutional rights by all the Massachusetts Defendants, and also those state actors and agents of state actors, such as NASED, Cohen and Twitter, who predictably will claim to be wholly private individuals, even though the very existence of NASED and its actions, via its salaried Executive Director Cohen on behalf of Tassinari, O'Malley and Galvin, are inextricably linked with state action. Through its Trusted Partner program and its collaboration with EI-ISAC, an infrastructure created with Twitter's own involvement with Tassinari and Cohen, Twitter is inextricably linked with state actors and actively provides the government a stealthy end run around First Amendment restrictions. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531

U.S. 288 (2001) It is impossible to tell where Twitter ends and where the government begins. Even when Cohen, NASED and Twitter falsely claim that they are private persons, they shall not escape the reach of 42 U.S.C. § 1985. **Congress passed the** Ku Klux Klan Act *to hold liable precisely persons like them, for monetary damages*.

236.     All of the Defendants are bound by the very same conspiracy and goal: suppress dissemination of tweets that reveal official emails that confirm conscious violation of Federal law. All Defendants coordinated their attack on Dr. Shiva's political speech in conscious, willful, contemptuous violation of his First Amendment right to the highest protections for his political speech and his Fourteenth Amendment right to equal protection under the law. *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

237.     Here it is undisputed that the Defendants stifled the Plaintiff political candidate's political speech during an election campaign based solely on the content of Plaintiff's speech. This was *per se* unconstitutional. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015), *Citizens United, supra*

238.     The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on Twitter for half of the last month prior to Election Day, November 3, 2020, caused massive irreparable harm to him as he was running for Federal office as a Write-In candidate. Dr. Shiva had built up a following of 360,000 followers on Twitter and via Twitter had a reach that did not require additional expense, compared to advertising on television. Twitter is a monopoly in the social media space when it comes to political speech. There is no other platform that comes close to Twitter. A politician not on Twitter everyday is a nobody. The Defendants willfully made Dr. Shiva's voice disappear at a crucial time in order to obstruct justice, conceal official evidence and make him a nobody politically.

239.     Under established case law, members of a conspiracy are substantively liable for the

foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946) But for Twitter implementing its Trusted Partnership program and collaborating with EI-ISAC in order to help government actors covertly violate citizens' First Amendment rights, this effort to obstruct justice and violate Plaintiff's constitutional rights would not have succeeded.

240.       The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $10 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post- judgment interest from the Defendants.

## COUNT SIX – VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

241.       The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $10 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post- judgment interest from the Defendants.

242.       Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

243.       At all relevant times each Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators

constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise."  Each of the Defendants participated in the operation or management of the enterprise.

244.     The Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the obstruction of justice, as described in the foregoing paragraphs of this complaint.  The Defendants realized that STATE ACTORS exposed them to prosecution for violation of Federal law, as well as civil action by Dr. Shiva. The Defendants were also aware that Dr. Shiva had filed a sworn criminal complaint against them with US Attorney Andrew Lelling. They acted swiftly and powerfully to conceal this evidence, to suppress Dr. Shiva's political speech entirely, and actively distributed through the "free press" their false narrative that digital ballot images are not covered by the retention requirements of Federal law and that Dr. Shiva's claim is false. The Defendants' false narrative now appears whenever anyone uses a search engine to read about Dr. Shiva and his claim, and appears more prominently such that one's eyes catch the Defendants' narrative before one gets to read Dr. Shiva's evidence. This is intentional.

245.     Their coordinated action, the enterprise, was intended to obstruct justice in violation of 18 U.S.C. § 1503. The enterprise has been structured to operate as a unit in order to accomplish the goals of their scheme. All Defendants are in agreement that they needed to censor Dr. Shiva, and acted to do so through their enhanced, priority, Trusted Partner relationship with Twitter and the coercive power they wield over Twitter via CISA and EI-ISAC, and to conceal their doing so, and to claim that Twitter acted all on its own to delete them and suppress Dr. Shiva's political speech about a matter of great public concern.

246.     The     enterprise     also     included     intentional,     conscious     material     factual

misrepresentations to this court under oath.

247.     The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). First they identified Dr. Shiva's dissemination exposing the STATE ACTORS as a threat that could lead to indictments for violation of Federal election law given his sworn criminal complaint to US Attorney, then they acted in concert through abuse of official powers and relationships to conceal the Defendants actions, then they acted in concert to ensure Dr. Shiva was slandered and libeled internationally for stating that Massachusetts destroyed ballots, then they ensured his own voice disappeared entirely - for weeks at a time - in retaliation for each time he tried to publicly expose the content of the STATE ACTORS emails. Eventually, through the use of 24-hour surveillance and a 17-minute response time the Defendants silenced Dr. Shiva permanently on Twitter, which is a severe, crippling, ***ongoing harm*** that in addition to muzzling him, makes it impossible for him to ever campaign for public office. In sum, the Defendants consciously operated a racketeering enterprise whose main goal was the obstruction of justice and ***ongoing*** suppression of a credible witness. This racketeering enterprise remains ongoing, and includes false testimony and false affidavits presented to Judge Wolf in *the Ayyadurai v. Twitter* et al., lawsuit..

248.     As a direct and proximate result of the predicate acts of racketeering by the enterprise, including but not limited to using their VIP status within the domestic censorship infrastructure that they architected, abusing the huge influence of the office of STATE ACTORS, the amplification provided by federal actiors, the communications with Defendants - which the conspirators know are not easily discoverable public records and which Defendants chose to conceal, and other acts in furtherance of their continuing effort to obstruct justice, yet to be revealed by court- ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury includes but is not limited to being

cheated out of a free and fair election, global loss of reputation and goodwill, severe emotional distress, and with his deplatforming off Twitter, a massive loss of monthly income, loss of his ability to pursue a career in politics and the near-total silencing of his speech.

249.     Given that Dr. Shiva's family chose to live in the United States and sacrificed greatly to rebuild their lives in a new country because they believed that in this country freedom of speech would be protected by officials, Dr. Shiva has been severely shocked Defendants share the very same contempt for freedom of speech and the rights of the individual as government officials back in the Socialist British Commonwealth of India.

250.     Further, these injuries to Dr. Shiva were a direct, proximate, reasonably foreseeable and intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the ultimate victim of the Defendants' unlawful enterprise.

251.     Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946)  The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $10 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

252.     Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble damages plus costs and attorneys fees from the Defendants.

**COUNT SEVEN – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

253.     Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

254.     Due exclusively to the Defendants' enterprise, Dr. Shiva was made to live in fear that

his speech regarding the official evidence contained in the Tassinari emails would inevitably and swiftly lead to his silencing on social media, during his political campaign for U.S. Senate.

255.    This is *per se* intolerable in a country founded for the specific purpose of being the exact opposite of Her Britannic Majesty's United Kingdom in terms of protections for political speech, and which on paper at least provides "special protection" for political speech on matters of great public concern. "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment.*" Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985) *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)(government officials are prohibited from retaliating against political speech during a campaign)

256.    This was extremely shocking to Dr. Shiva and has shaken him to his core. The rug has been pulled out from under his feet. It is as if he is on the other side of the looking glass, something he never anticipated, a stranger in a land that he no longer recognizes. Dr. Shiva finds this experience extremely distressing and most unwelcome. The Defendants' actions have gutted his lifelong beliefs in the American system and is now dependent on this court for relief.

257.    To prevail on his claim for intentional infliction of emotional distress, Dr. Shiva must establish "(1) that the Defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the Defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was

severe and of such a nature that no reasonable person could be expected to endure it." *Payton v. Abbott Labs*, 386 Mass. 540, 555 (1982), citing *Agis v. Howard Johnson Co*., 371 Mass. 140, 145 (1976)

258.     All four factors have already been pleaded with particularity in this complaint, with the benefit of revelations from sworn testimony and the *Long Fuse Report* which detailed the surveillance that Dr. Shiva was subjected to 24 hours a day.

259.     The Defendants' cold, heartless, intentional, infliction of extreme anguish on Dr. Shiva in order to corruptly extort suppression of an official email that confirmed the violation of Federal law, silence him totally on Twitter, and label him a "pseudo-scientist" and baseless conspiracy theorist, is beyond the bounds of human decency. *Commonwealth v. Adams*, 416 Mass. 558 (1993)('the officers, in the phrase of the day, `don't get it,' and they do not understand how unacceptably they acted thereafter'). Dr. Shiva is entitled to substantial remedy from this court.

260.     The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $10 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

261.     Dr. Shiva requests such other and further relief as this court may deem just and proper.


**COUNT EIGHT – ISSUANCE OF A PERMANENT INJUNCTION ENJOINING DEFENDANTS FROM VIOLATING Dr. SHIVA'S OR ANYONE'S POLITICAL SPEECH**


262.     Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

263.     Defendants  been sued in his official capacity in order to obtain from Federal court a

permanent injunction that enjoins him from continuing to suppress political speech and from

silencing a candidate wholesale during the candidate's election campaign, be it for Federal,

state or local office, or at any time after. This is permissible under the exception carved out

by the Court for prospective injunctive relief from ongoing harm, under *Ex parte Young*, 209

U.S. 123 (1908)

264.     STATE ACTORS, federal actors, and SOCIAL MEDIA ACTORS have established

a Trusted Partner program solely for state actors to violate the First Amendment covertly

under the garb of the private sector, in addition to being a state actor itself via its involvement

with CISA via EI-ISAC, an inherently coercive relationship. Because of CISA and EI-ISAC,

should this court order Defendants to stop shadowbanning Dr. Shiva's accounts on all

SOCIAL MEDIA PLATFORMS, the deplatforming shall be reversed overnight. Nothing

prevents the infrastructure from operating in reverse.

265.     The court must weigh four factors when deciding whether to grant injunctive relief:

(1) The likelihood of success on the merits; (2) The potential for the movant to be irreparably

harmed by denial of the relief; (3) The balance of the movant's hardship if  relief is denied

versus the nonmovant's hardship if relief is granted; and (4) The effect that granting relief

will have on the public interest. *Phillip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st

Cir., 1998), *Monsanto v. Geertson*, 561 U.S. 139 (2010), *Trump v. Hawaii*, 585 U.S. ____

(2018), *Arborjet, Inc. v. Rainbow Treecare*, 794 F.3d 168 (1st Cir. 2015), *Planned

Parenthood League v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981)  These factors are easily met in

this action.

(1) <u>Likelihood of success on the merits favors the Plaintiff</u>

-    The facts of this case demonstrate that the Plaintiff here has a great likelihood of

success on the merits because it is beyond dispute that Defendants colluded to

maintain plausible deniability if discovered, violated an explicit prohibition on any

government official imposing content-based restrictions on speech, especially on a political

candidate in the midst of his campaign. There are few cases where the required result is as

open and shut as enjoining a government official from continuing to abuse his official power

to censor speech and make a candidate's voice disappear. *Citizens United v. Federal Election*

*Commission*, 558 U.S. 310 (2010)

- Here it is undisputed that  Defendants together stifled the plaintiff political

   candidate's political speech during an election campaign based solely on the content

   of plaintiff's speech, which exposed irregularities in the way Defendants conducted

   and influenced the counting of votes during the recent Republican primary elections,

   and exposed an official email that confirmed that Defendants consciously violated

   Federal law, a matter of great public concern. This was unconstitutional *per se.*

- This count_ seeks a permanent injunction upon Defendants. A court order is

   necessary because these Defendants have already deplatformed earlier and now

   shadowban Dr. Shiva, which as detailed above, is causing him severe and multiple

   harms every single day that this is in place.

- The Plaintiff, the candidate who has been consciously and willfully harmed in a most

   un-American fashion by Defendants, is assured of succeeding on the merits of his

   claim. His claim also meets the required plausibility standard. *Ashcroft v. Iqbal*, 556

   U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Iannacchino*

   *v. Ford Motor*, 451 Mass. 623 (2008).

(2) This political candidate has already been irreparably harmed

- The Defendants had Dr. Shiva blocked from using from Twitter for nearly two years. This caused massive harm to a Write-In candidate. And on February 1, 2021 Defendants permanently deplatformed Dr. Shiva from Twitter through a permanent suspension which, as detailed above, is causing him severe and multiple harms every single day that the suspension is in place.

- "Entitled" means this court is duty-bound to immediately enjoin Galvin from ongoing willful violations of the Constitution including causing Dr. Shiva's political speech to be silenced on Twitter to this day. The Defendants have actively cheated Dr. Shiva out of a free and fair election in 2020, and must be enjoined by this court from doing it again in the future, a prospect that is very likely to recur. *Already v. Nike*, 568 U.S. 85 (2013).

(3) Defendants face no harm from an injunction

- Galvin faces no harm whatsoever from being required by this court to further refrain from abusing his office to violate the candidate plaintiff's free speech rights and to be enjoined from stifling political speech on a matter of public concern. NASED faces no harm from being required by this court to comply with the U.S. Constitution and refrain from using its clout to help State Election Directors nationwide silence political speech. Twitter faces no harm for being called out for assisting the government to covertly violate the First Amendment. An injunction may even protect Twitter from further government coercion or inducement. Again, no voluminous briefing is required for this court to follow hornbook law. "Strong medicine is required to cure the Defendant's disrespect for the law." *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2000) The injunction must issue.

    <u>(4) The requested injunction is in the public interest</u>

- It is in the public interest to uphold the rule of law and require elected officials to stop abusing their office to impose content-based restraints on political speech during an election campaign in order to actively sabotage a candidate's prospects and throw the election.  It is in the public interest to comply with 100 years of Supreme Court rulings that require courts to strongly support and protect First Amendment rights. *Snyder v. Phelps*, 562 U. S. 443 (2011)

- It is settled law in that a court can maintain jurisdiction over a public servant to enjoin future violations of the law even when the record indicates only one prior violation.

- The relief sought is for the court to enjoin these Defendants from silencing ***any and all candidates in the future***, just as in *Adams*. The relief sought is for this court to maintain jurisdiction over these Defendants ***so they do not again violate the constitutional rights, both state and federal, of a candidate for federal office***.

- In summary, the permanent injunction must be issued restoring Dr. Shiva's account on Twitter, and maintaining a tight leash on the Defendants in order to ensure they do not silence the speech of candidates in the future.


## COUNT NINE – DEFAMATION

266.      Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

267.     The Defendants actively acted in concert to defame Dr. Shiva in order to damage his credibility as a complainant and witness. This defamation was part and parcel of their comprehensive effort to obstruct justice and give the US Attorney the impression that Dr. Shiva is an unscientific, unhinged, wild, conspiracy theorist. This effort also served to misdirect the public away from the fact that Defendants ensure that digital ballot images are deleted in conscious violation of Federal law 52 USC 20701.

268.     The Defendants issued their own statements to known collaborators of EI- ISAC, namely AP and Reuters. The defendants trotted out their associate Charles Stewart III to add the "independent" gravitas of the MIT brand to support their false narrative, while all concerned concealed from the American people that Tassinari sits on the Board at Stewart's Lab at MIT.

269.     The Defendants then had their close collaborator, and later co-author of the Long Fuse Report, Ashwin Ramaswami, attack Dr. Shiva via Wikipedia by describing him as a "pseudo-scientist" who pushes conspiracy theories. Ramaswami did this on behalf of Cohen and CISA despite knowing that Dr. Shiva has published his scientific research in **Nature**, the #1 science journal on earth.

270.     A plaintiff must show that:

"(a) The defendant made a statement, concerning the plaintiff, to a third party,

(b)  The statement could damage the plaintiff's reputation in the community,

(c)  The defendant was at fault in making the statement; and,

(d)  The statement either caused the plaintiff economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss.

Here, four types of statements are actionable without proof of economic loss: statements

that constitute libel; statements that charge the plaintiff with a crime; statements that allege that the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." *Ravnikar v. Bogojavlensky*, 438 Mass. 627 (2003)

271.    The actions by the Defendants, taken in concert in order to impeach the credibility of a complainant who reported a crime, meet the *Ravnikar* standard.

272.    The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $50 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

### COUNT TEN  - IMPLIED RIGHT TO PRIVATE ACTION AGAINST TWITTER FOR INTERFERING IN A FEDERAL ELECTION AS AN UNDECLARED SUPER-PAC

273.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

274.    SOCIAL MEDIA COMPANEIS holds itself out as an internet platform under the "Good Samaritan" protections of the Communications Decency Act, 47 U.S. Code § 230: Protection for "Good Samaritan" blocking and screening of offensive material: Treatment of publisher or speaker - No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. (2) Civil liability - No provider or user of an interactive computer service shall be held liable on account of—(A) any action *voluntarily taken in good faith to restrict access* to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is

constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).  emphasis added

275.    The law states that any action by Twitter must be done "voluntarily" and "in good faith" in order to avail of section 230 immunity.  Twitter's action against this Plaintiff was **_not_** voluntary and **_not_** in good faith. Twitter established and runs a Trusted Partner program in order to provide government actors a covert mechanism to violate citizens' First Amendment rights and apply content-based restraints on the speech of political candidates in the midst of their campaigns. In addition, as a Collaborator with EI-ISAC, Twitter acts entirely at the behest of government officials and the Department of Homeland Security and takes no action on its own in good faith. The deplatforming of Dr. Shiva on February 1, 2021, **_within 17-minutes_**, after his speech was surveilled by teams on rotating shifts, was the definition of acting in bad faith! If it had been in good faith, Cardille and Twitter would not have lied about it under oath.

276.    On behalf of the Defendants and at their request, Twitter consciously chose to interfere in the conduct of an election for Federal office, the 2020 Republican primary for US Senator from Massachusetts. On behalf of Massachusetts Defendants, Twitter blocked this Plaintiff, a candidate whose speech was fully protected by Massachusetts law, as construed by the SJC in *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015) and Federal law. *Citizens United*, supra  There was no lawful basis underlying Twitter's decision to silence this Plaintiff's campaign statements during his election campaign in Massachusetts. As a direct result of its unlawful actions, Twitter ensured a significant advantage to the Plaintiff's opponents, Kevin O'Connor, and Edward

Markey.

277.    It is elementary that Plaintiff's revealing screenshots of public emails – on September 25, 2020, 25 days *after* the U.S. Republican Primary election was over –, which documented that Tassinari and Galvin knew full well that they were required by Federal law to preserve digital ballot images created in an election that was already over on September 1, 2020, does not in any way constitute "content that may suppress participation or mislead people about when, where, or how to participate in a civic process."   The only legitimate conclusion from the record already available in this case is that Twitter's preferred reason for deleting the tweets and suspending this Plaintiff, and now permanently as of February 1, 2021, was entirely pretextual, in deliberate bad faith, and entirely due to its Trusted Partner relationship with the Defendants and its collaboration with the EI-ISAC infrastructure architected by Tassinari and Cohen. Twitter's bad faith actions in this case strip it of any "Good Samaritan" immunity granted by Section 230.

278.    In addition, actively interfering in the conduct of a Federal election, in this case the three-way race between this Plaintiff, Kevin O'Connor and Edward Markey, violated Federal election laws and granted Plaintiff's opponents a massive impermissible benefit. Twitter acted as an un-registered un-declared SuperPAC instead of a neutral internet platform. Twitter's action equates to it running negative attack advertisements against this Plaintiff during a campaign, in conscious violation of Federal election law. Twitter didn't just publish against this candidate, it silenced this candidate to allow his opponent a free and clear field.

279.    Twitter naturally will claim that no statute provides candidates with a private cause

of action for violation of Federal election law. That ship sailed in 1916 when the Court ruled in *Texas and Pac. Rly. v. Rigsby*, 241 U.S. 33 (1916) that courts may recognize an implied private cause of action, and ruled further that a private cause of action is permissible to redress violations of Federal law when the agency charged with policing those violations either lacks the resources to do so, *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964), or because the agency's administrators may abuse their discretion and fail to act because they are unsympathetic to the legislative purpose of the statute, *Wills v. Trans World Airlines, Inc.*, 200 F. Supp. 360 (S.D. Cal. 1961)(*Failure of the Civil Aeronautics Board to employ even its limited sanctioning powers demonstrated the need for private action*) For more than fifty (50) years thus there has been no exclusive right of action by administrative agencies because that could lead to manifest injustice and corruption, both of which public concerns are vital to the proper functioning of this democracy and supersede any deference owed to administrators. It is beyond dispute that corporations may not interfere in a Federal election against or for any candidate without publicly declaring their involvement and without filing records with the Federal Election Commission. Twitter did not register with the Federal Election Commission as a Super PAC.

280.    In our case here, Twitter is already a Defendant in a RICO claim, and it will be an efficient use of scarce public resources to evaluate in this court itself claims against Twitter for conscious violation of Federal election law and the consequent abrogation of Section 230 immunity.

281.    By actively functioning as an undeclared unregistered Super-PAC and interfering with the course and conduct of Plaintiff's campaign for Federal office in favor of his

opponents Kevin O'Connor and Edward Markey, Twitter has massively and unlawfully harmed this political candidate. Twitter's action both sounds in tort as well as a constitutional violation claim given that Twitter acted wholly as an agent of government officials. As a direct and proximal result of Twitter's conscious violation of Federal election law and its Section 230 status, Dr. Shiva has been massively and irreparably damaged, and his injury includes but is not limited to being cheated out of a free and fair election, global loss of reputation and goodwill, and with his deplatforming off Twitter, a massive loss of monthly income, loss of his ability to pursue a career in politics and the near-total silencing of his speech.  Twitter must be punished and held liable for exemplary damages in order to ensure that neither Twitter nor any of the other Big Tech firms repeat this violation in any election in the future, with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

**COUNT ELEVEN  -  Federal Tort Claims Act - 28 U.S.C. § 1346(b)**
***Intentional Infliction of Emotional Distress***

282.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

283.    CISA officials acted within the scope of their office or employment under circumstances where the United States, if it were a private person, would be liable to Plaintiff in accordance with existing State laws.

284.    CISA knowingly, intentionally, and/or recklessly caused Plaintiff severe emotional distress by de-platforming him and shadow banning his accounts.

70

285.     CISA took these actions in furtherance of their censorship, which policy was to deny

         speech of Plaintiff to reach his audience that they arbitrarily deemed.

286.     CISA's  knowing or reckless conduct caused Dr. Shiva to suffer extreme emotional

         distress that continued for an extended period of time.

287.     The emotional distress caused by CISA agents' actions was severe.

288.     Plaintiff is entitled to actual and compensatory damages individually

### COUNT TWELVE  -   Federal Tort Claims Act - 28 U.S.C. § 1346(b)
### *Negligence*

289.     Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

290.     CISA agents acted within the scope of their office or employment under

         circumstances where the Defendant United States of America, if it were a private

         person, would be liable to Plaintiff in accordance with the laws of any State. *See*, 28

         U.S.C. § 1346(b).

291.     CISA Defendant owed a legal duty of ensuring Dr. Shiva was not treated as a foreign

         adversary, which he was not, but a political candidate for then U.S. Senate and now

         for U.S. President.

292.     CISA officials breached the duty they owed to Dr. Shiva, as U.S. Citizen.

293.     Defendant is liable for the negligent acts of CISA employees acting on its behalf.

294.     The actions of Defendant constitute negligence under District of Columbia law.

295.     Plaintiff is entitled to actual and compensatory damages individually

**COUNT THIRTEEN  -   Federal Tort Claims Act - 28 U.S.C. § 1346(b)**
***Wrongful Action***

296.     Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein

297.     CISA agents acted within the scope of their office or employment under circumstances where Defendant United States of America, if it were a private person, would be liable to Plaintiff in accordance with the laws of the State. *See* 28 U.S.C. § 1346(b).

298.     Defendant United States of America's actions involved  wrongful actions

299.     CISA   agents wrongfully associated Dr. Shiva's posts as misinformation and disinformation.

300.     Through their wrongful actions, CISA agents violated their duty to provide Dr. Shiva the right to free speech.

301.     CISA Defendant is liable for the wrongful acts of CISA agents acting on its behalf.

302.     Plaintiff is entitled to actual and compensatory damages individually.

**COUNT FOURTEEN  -   Bivens Against CISA Officials Against Unknown Customs and
Border Protection Agents**

303.     Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

304.     To recover damages for a federal agent's violation of their constitutional rights, a

plaintiff must establish a (1) constitutional violation (2) by individual federal defendants acting under color of federal law or authority. *See, Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

305.    CISA, Jen Easterly, and Unknown CISA agents violated Dr. Shiva's First Amendment of the United States Constitution

306.    CISA, Jen Easterly, and Unknown CISA agents were acting within the scope of their authority as federal law officials when they violated Dr. Shiva's constitutional rights.

307.    Plaintiff is entitled to actual, compensatory, and punitive damages as a result of these Defendants  violations of Shiva's constitutional rights individually.


**COUNT FIFTEEN -  BREACH OF CONTRACT by SOCIAL MEDIA PLATFORMS**

308.    The Terms of Service and Community Guidelines constitute a valid and enforceable written contract between SOCIAL MEDIA PLATFORMS Defendants and Dr. Shiva. Pursuant to their Terms of Service and Community Guidelines, they  agreed to provide access their posting and hosting, streaming, and advertising services to Plaintiff.

309.    As with all contracts, the Terms of Service and Community Guidelines contain an implied covenant of good faith and fair dealing. This is particularly true because, in those contracts, these platforms assumed for themselves unilateral and unfettered discretionary control over virtually every aspect of their relationship with Dr.Shiva – control  they have exercised at their whim, repeatedly and without notice to Dr. Shiva, and without an opportunity for meaningful discussion or appeal. To the extent that

those discretionary powers are valid, they are obligated to exercise them honestly, fairly and in good faith.

310.     These Defendants materially breached the Terms of Service and Community Guidelines and the covenant of good faith and fair dealing by (a) censoring Dr. Shiva because of his political views, thoughts, speech and expression, (b) secretly changing algorithms so as to cause his content to be automatically flagged, (c) failing to actually review his content to determine whether the videos in any way violated the Community Guidelines, (d) falsely stating that a review had taken place and content violated the Community Guidelines, (e) assigning flags to his content, and (f) shadowbanning, constraining his account.

311.     As a direct result of their material breaches, Dr.Shiva suffered damage and loss, including, but not limited to, loss or injury to business, loss of good will, costs, and other out-of-pocket expenses and damages in the sum of $5,000,000.00 or such greater amount as is determined by the Jury.

**PRAYER FOR RELIEF**

Plaintiff respectfully request that the Court enter judgment in their favor and grant the following relief:

A.     Declare that Defendants' conduct violates the First Amendment of the U.S. Constitution and analogous provisions of Missouri's, Louisiana's, and other States' Constitutions;

B.     Declare that Defendants' conduct is *ultra vires* and exceeds their statutory authority;

C.      Declare that Defendants' conduct violates the Administrative Procedure Act and is unlawful, and vacate and set aside such conduct;

D.      Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in unlawful conduct as alleged herein;

E.      Enter judgment in favor of Plaintiff, and against Defendants, on all counts of the Complaint;

F.      Award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the loss that has been caused by the conduct of Defendants alleged herein;

G.      Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

H.      Provide actual and compensatory damages arising from the negligence and/or intentional, knowing, or reckless and wrongful actions of Defendant United States of America's employees and agents in violation of the FTCA;

I.      Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to demand, urge, pressure, or otherwise induce any social-media platform to censor, suppress, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content or viewpoint expressed on social media; and

J.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DR. SHIVA AYYADURAI, PHD
701 Concord Avenue
Cambridge, MA 02138
Telephone:  (617) 631-6874
Email: vashiva@cytosolve.com


Dated: December 2, 2023